## STANDARD FORM OF UNION AGREEMENT

## SHEET METAL, ROOFING, VENTILATING AND AIR CONDITIONING CONTRACTING DIVISIONS OF THE CONSTRUCTION INDUSTRY

Agreement entered into this first day of July, 2023 by and between Northern Indiana Sheet Metal Contractors Association, Inc. and each business establishment individually, whether represented by a contractor association or not, hereinafter referred to as the Employer, and Local Union No. 20 of International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART), hereinafter referred to as the Union for Jasper, Laporte, Lake, Newton, Porter, Pulaski and Starke counties in Indiana.

# ARTICLE I

SECTION 1. This Agreement covers the rates of pay and conditions of employment for all employees of the Employer engaged in but not limited to the: (a) manufacture, fabrication, assembling, handling, erection, installation, dismantling, conditioning, adjustment, alteration, repairing and servicing of all ferrous or nonferrous metal work and all other materials used in lieu thereof and of all HVAC systems, airveyor systems, exhaust systems, and air-handling systems regardless of material used including the setting of all equipment and all reinforcements in connection therewith; (b) all lagging over insulation and all duct lining; (c) testing and balancing of all air-handling equipment and duct work; (d) the preparation of all shop and field sketches whether manually drawn or computer assisted used in fabrication and erection, including those taken from original architectural and engineering drawings or sketches; (e) metal roofing; and (f) all other work included in the jurisdictional claims of International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART).

See Addendum I.

# ARTICLE II

SECTION 1. No Employer shall subcontract or assign any of the work described herein which is to be performed at a jobsite to any contractor, subcontractor or other person or party who fails to agree in writing to comply with the conditions of employment contained herein including, without limitations, those relating to union security, rates of pay and working conditions, hiring and other matters covered hereby for the duration of the project.

SECTION 2. Subject to other applicable provisions of this Agreement, the Employer agrees that when subcontracting for prefabrication of materials covered herein, such prefabrication shall be subcontracted to fabricators who pay their employees engaged in such fabrication not less than the prevailing wage for comparable sheet metal fabrication, as established under provisions of this Agreement.

See Addendum II.

# ARTICLE III

SECTION 1.  The Employer agrees that none but journeymen, apprentice, preapprentice and sheet metal workers shall be employed on any work described in Article I and further, for the purpose of proving jurisdiction, agrees to provide the Union with written evidence of assignment on the Employer's letterhead for certain specified items of work to be performed at a jobsite prior to commencement of work at the site.  List of such specific items, which may be revised from time to time, as agreed to by and between SMACNA and SMART, shall be provided to the Employer.

See Addendum III.

# ARTICLE IV

SECTION 1.  The Union agrees to furnish upon request by the Employer duly qualified journeymen, apprentice and preapprentice, sheet metal workers in sufficient numbers as may be necessary to properly execute work contracted for by the Employer in the manner and under the conditions specified in this Agreement.

See Addendum IV.

# ARTICLE V

SECTION 1.  The Employer agrees to require membership in the Union, as a condition of continued employment of all employees performing any of the work specified in Article I of this Agreement, within eight (8) days following the beginning of such employment or the effective date of this Agreement, whichever is the later, provided the Employer has reasonable grounds for believing that membership is available to such employees on the same terms and conditions generally applicable to other members and that membership is not denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fee uniformly required as a condition of acquiring or retaining membership.

SECTION 2. The Union may request recognition as the exclusive collective bargaining agent for all employees employed by the Employer in the classifications and geographic jurisdiction covered by this Agreement, whether or not they are members of the Union. In determining whether the union has the support of a majority of the Employer's employees, such showing may be based upon either a majority of those employed at the time such recognition is requested, or, a majority of those eligible to vote under the National Labor Relations Board's Steiny-Daniel formula. No later than 10 days following the Union's request, the Employer shall review employees' authorization cards submitted by the Union in support of its claim to represent and have the support of a majority of such employees. If a majority of the employees has designated the Union as their exclusive collective bargaining representative, the Employer will recognize the Union as such majority representative of all employees in the classifications and geographic jurisdiction covered by this Agreement. The Employer shall not file or cause the filing of a petition for election or unfair labor practice charge with the National Labor Relations Board in connection with any demands for recognition provided for here.

2

Article X of this Agreement shall be the sole and exclusive means of resolving any dispute concerning this provision.

SECTION 3.  If during the term of this Agreement the Labor-Management Relations Act of 1947 shall be amended by Congress in such manner as to reduce the time within which an employee may be required to acquire union membership, such reduced time limit shall become immediately effective instead of and without regard to the time limit specified in Section 1 of this Article.

SECTION 4.  The provisions of this Article shall be deemed to be of no force and effect in any state to the extent to which the making or enforcement of such provisions is contrary to law. In any state where the making and enforcement of such provision is lawful only after compliance with certain conditions precedent, this Article shall be deemed to take effect as to involved employees immediately upon compliance with such conditions.

SECTION 5.  The Employer agrees to deduct the appropriate amount for dues, assessment or service fees (excluding fines and initiation fees) from each week's pay of those employees who have authorized such deductions in writing, irrespective of whether they are Union members.  Not later than the 20th day of each month, the Employer shall remit to the designated financial officers of the International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART) and the Local Union the amount of deductions made for the prior month, together with a list of employees and their social security numbers for whom such deductions have been made.

See Addendum V.

# ARTICLE VI

SECTION 1.  **Regular Work Day and Work Week.** The regular working day shall consist of eight (8) hours labor in the shop or on the job between six 6:00 a.m. and six 6:00 p.m. and the regular working week shall consist of five (5) consecutive eight hour days of labor in the shop or on the job, beginning with Monday and ending with Friday of each week.  All full time or part time labor performed during such hours shall be recognized as regular working hours and paid for at the regular hourly rate specified in this agreement.  The contractor must establish a regular working day of eight hours between the hours of 6:00 A.M. to 6:00 P.M.  Any hours worked before or after the established shift shall be paid at the established overtime rate.

The Employer is allowed up to four (4) hours of overtime prior to the established starting time at which time the employee reverts to straight time for up to eight (8) hours or time actually worked.

Employees shall be at the shop or project site at scheduled starting time each day and shall remain until quitting time.

SECTION 2.  **Holidays.**  All Sundays shall be recognized as holidays, in addition to the following legal holidays recognized and observed within the territory covered by this agreement: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and

Christmas Day or days locally observed as such.  When one or more of the aforementioned holidays falls on Saturday the proceeding Friday shall be recognized as a work week holiday and when one of the aforementioned holidays falls on Sunday the following Monday shall be recognized as a work week holiday and any work performed on both days shall be paid at the rate of double-time.  (See Addendum VI, Ref. Article VI, Section 2.)

SECTION 3.  It is agreed that all work performed outside of regular working hours during the regular work week and on holidays shall be performed only upon notification by the Employer to the Union in advance of scheduling such work.  Preference on overtime and holiday work shall be given to employees on the job on a rotation basis so as to equalize such work as nearly as possible.

Except as provided in Section 4 of this Article, all labor in connection with or incidental to work covered by this Agreement shall be performed within the regular working hours specified in Section 1 of this Article of this Agreement and no overtime shall be permitted or required outside of regular working hours or on holidays specified in this Agreement except in cases of emergency when, by mutual consent of both the Employer and the Union, such emergency overtime may be permitted and in all cases where such emergency work is permitted or required outside of the regular working hours specified in Section 1 of this Article or on holidays specified in Section 2 of this Article, double time shall be paid for Sundays and holidays. Time and one-half shall be paid for overtime on weekdays and other overtime work scheduled as follows:

Double time shall be paid for all work performed after 12 hours on weekdays. Work performed on Saturday shall be paid as follows:  Up to ten (10) hours of work performed on Saturday shall be paid at one and one half (1½) times the regular hourly rate.  All work over ten (10) hours performed on Saturday shall be paid at two (2) times the regular hourly rate.

SECTION 4.  Shift work and the pay and conditions therefore shall be only as provided in written addenda attached to this Agreement.  Energy Conservation-Retrofit work performed outside the regular work day in occupied buildings shall be performed under shift work conditions to be established by the local parties or by the National Joint Adjustment Board on the request of either party, if not locally provided.

See Addendum VI.

# ARTICLE VII

SECTION 1.  When employed in a shop or on a job within the limits of (see Addendum VII) employees shall be governed by the regular working hours specified herein and shall provide for themselves necessary transportation within the said limits from home to shop or job at starting time and from shop or job to home at quitting time, and the Employer shall provide, or pay, for all necessary additional transportation during working hours.

SECTION 2.  When employed outside of the limits specified in Section 1 of this Article, and within the jurisdiction of the Union, employees shall provide transportation for themselves which will assure their arrival at the limits specified in Section 1 of this Article at regular starting time, and the Employer shall provide or pay for all additional transportation for such jobs,

including transportation from such job back to the limits specified in Section 1 of this Article which will assure arrival at such limits at quitting time.  As an alternative to the foregoing method, travel expenses may be paid by a zone or other method of payment.  If this alternative method is used, it will be provided in a written addendum attached hereto.  If an Employer sends an employee to perform work outside of the territorial jurisdiction of the United States of America or Canada, travel pay and/or subsistence arrangements shall be negotiated locally.

The parties intend travel pay to fairly compensate employees for travel, not to place contractors at a competitive disadvantage due to geographic location or to create artificial barriers against out of area contractors.

See Addendum VII.

# ARTICLE VIII

SECTION 1.  The minimum rate of wages for journeymen sheet metal workers covered by this Agreement when employed in a shop or on a job within the jurisdiction of the Union to perform any work specified in Article I of this Agreement shall be (see Addendum VIII) per hour, except hereinafter specified in Section 2 of this Article.

SECTION 2.  On all work specified in Article I of this Agreement, fabricated and/or assembled by journeymen, apprentices and/or preapprentices within the jurisdiction of this Union, or elsewhere, for erection and/or installation within the jurisdiction of any other collective bargaining areas or local union affiliated with International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART), whose established wage scale is higher than the wage scale specified in this Agreement, the higher wage scale of the jobsite Union shall be paid to the employees employed on such work in the home shop or sent to the jobsite.

The Union may at any time request wage verification from the Employer of such to prove that the higher wage and benefit package is being compensated to those shop employees.

SECTION 3.  The provisions of Section 2 of this Article, Section 2 of Article II and Section 1 of Article III shall not be applicable to the manufacture for sale to the trade or purchase of the following items:

1.    Ventilators
2.    Louvers
3.    Automatic and fire dampers
4.    Radiator and air conditioning unit enclosures
5.    Fabricated pipe and fittings for residential installations and light commercial work as defined in the locality
6.    Mixing (attenuation) boxes
7.    Plastic skylights
8.    Air diffusers, grilles, registers
9.    Sound attenuators
10.   Chutes
11.   Double-wall panel plenums

12.    Angle Rings

SECTION 4.  The provisions of Section 2 of this Article shall not be applicable to AIR POLLUTION CONTROL SYSTEMS fabricated for the purpose of removing air pollutants, excluding air conditioning, heating and ventilating systems.  In addition, the provisions of Section 2 of this Article will not be applicable to the manufacture of spiral pipes and fittings, except when such a provision is contained in the local union agreement or addendum to the SFUA**.**

SECTION 5.  Except as provided in Sections 2 and 6 of this Article, the Employer agrees that journeymen, preapprentice and classified sheet metal workers hired outside the territorial jurisdiction of this Agreement shall receive the wage scale and working conditions of the local Agreement covering the territory in which such work is performed or supervised.

SECTION 6.  When the Employer has any work specified in Article I of this Agreement to be performed outside of the area covered by this Agreement and within the area covered by another Agreement with another local union affiliated with the International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART), and qualified sheet metal workers are available in such area, the Employer may send no more than two (2) sheet metal workers per job into such area to perform any work which the Employer deems necessary, both of whom shall be from the Employer's home jurisdiction.  All additional sheet metal workers shall come from the area in which the work is to be performed.  Journeymen sheet metal workers covered by this Agreement who are sent outside of the area covered by this Agreement shall be paid at least the established minimum wage scale specified in Section 1 of this Article but in no case less than the established wage scale of the local Agreement covering the territory in which such work is performed or supervised, plus all necessary transportation, travel time, board and expenses (as provided for in Addendum VII) while employed in that area, and the Employer shall be otherwise governed by the established working conditions of the local Agreement.  If employees are sent into an area where there is no local Agreement of the International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART) covering the area then the minimum conditions of the home local union shall apply.

SECTION 7.  In applying the provisions of Sections 2, 5, and 6 of this Article VIII, the term "wage scale" shall include the value of all applicable hourly contractual benefits in addition to the hourly wage rate provided in said Sections.

SECTION 8.  **Welfare benefit contributions shall not be duplicated.**

When sheet metal workers are employed temporarily outside the jurisdiction of their home local union, the parties signatory to this Agreement agree to arrange through the Health and Welfare Trust Fund to transmit health and welfare contributions made on behalf of the employee to the Health and Welfare Trust Fund in the employee's home local union.

The parties to this Agreement agree to establish a system for continuing health and welfare coverage for employees working temporarily outside the jurisdiction of the local collective bargaining agreement when health and welfare contributions are transmitted on their behalf by trust funds from other areas.

When sheet metal workers are temporarily employed outside the jurisdiction of their home local union, the parties signatory to this agreement shall arrange to transmit any 401(k) contributions required to be made to a 401(k) plan where the work is performed to a 401(k) plan established for the employee's home local union, and/or to the National Supplemental Savings Fund.

This obligation is conditioned upon a suitable reciprocity arrangement being agreed to by the trustees of such plans.

SECTION 9.  **Time of payment.**  Wages at the established rates specified herein shall be paid weekly in the shop or on the job before quitting time on the same day weekly as established by the Employer, and no more than three working days following the ending of each pay period; however, employees when discharged shall be paid in full.  The employer has the option to use direct deposit.  Pay stubs can be provided either electronically or by mail, at the Employer's option. If a banking holiday occurs during a pay period, five working days following the end of the pay period are allowed for ACH direct deposit of wages to be processed.

SECTION 10.  **Show up time.**  Any sheet metal worker reporting for work at the regular starting time and for whom no work is provided, shall receive pay for two (2) hours at the stipulated rate for reporting unless he was notified by phone or direct contact not to report for work one (1) hour before starting time.  This provision, however, shall not apply under conditions over which the Employer has no control.

SECTION 11.  Each Employer covered by this Agreement shall employ at least one (1) journeyman sheet metal worker who is not a member of the firm on all work specified in Article I of this Agreement.  However, it will be permissible for an owner-member to be the journeyman sheet metal worker.

SECTION 12(a). Contributions provided for in Section 12(b) of this Article will be used to promote programs of industry education, training, negotiation and administration of collective bargaining agreements, research and promotion, such programs serving to expand the market for the services of the Sheet Metal Industry, improve the technical and business skills of employers, stabilize and improve Employer-Union relations, and promote, support and improve the employment opportunities for employees.  No part of any such payments, however, shall be used for any other purpose except as expressly specified above.

(b).  The Employer shall pay the Sheet Metal and Air Conditioning Contractors' National Industry Fund of the United States (IFUS) the hourly contribution rate established by the IFUS trustees.  The IFUS trustees shall notify the International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART) of any changes to the established contribution rate prior to such change becoming effective.  The Employer shall contribute said amount for each hour worked on and after the effective date of this Agreement by each employee of the Employer covered by this Agreement.  Payment shall be made on or before the 20th day of the succeeding month and shall be remitted to IFUS, 4201 Lafayette Center Drive, Chantilly, Virginia 20151-1219, or for the purpose of transmittal, through the Local Industry Fund.

(c).  The IFUS shall submit to the International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART) not less often than semi-annually written reports describing accurately and in reasonable detail the nature of activities in which it is engaged or which it supports directly or indirectly with any of its funds.  One time per year, the IFUS shall include in such written report a financial compilation attested to by a certified public accountant containing its balance sheet and detailed statement of annual receipts and disbursements.  Further specific detailed information in regard to IFUS activities or its receipts and/or expenditures shall be furnished to the International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART) upon written request.

(d).  Grievances concerning use of IFUS funds for purposes prohibited under Section 12(a) or for violations of other subsections of this Section may be processed by the International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART) directly to the National Joint Adjustment Board under the provisions of Article X of this Agreement.  In the event such proceedings results in a deadlock, either party may, upon ten (10) days notice to the other party, submit the issue to final and binding arbitration.  The Arbitrator shall be selected by the Co-Chairmen of the National Joint Adjustment Board.  The Arbitrator shall be authorized to impose any remedial order he deems appropriate for violation of this Section, including termination of the Employer's obligation to contribute to the IFUS.  The authority of the Arbitrator is expressly limited to a determination of a deadlocked issue under this Section (Section 12, Article VIII), and no other.

SECTION 13(a).  Contributions provided for in Section 13(b) of this Article will be used to promote programs of industry education, training, negotiation and administration of collective bargaining agreements, research and promotion, such programs serving to expand the market for the services of the Sheet Metal Industry, improve the technical and business skills of employers, stabilize and improve Employer-Union relations, and promote, support and improve the employment opportunities for employees.  No part of any such payments, however, shall be used for any other purpose except as expressly specified above.

(b).  The Employer shall pay to the Northern Indiana Sheet Metal Contractors Association, Inc., P.O. Box 636, Chesterton, IN  46304 (hereinafter referred to as the Local Industry Fund), the hourly contribution rate established by the trustees of such local industry fund. The trustees of the local industry fund shall notify the local union of any changes to the established contribution rate prior to such change becoming effective. The Employer shall contribute the established rate per hour for each hour worked on and after the effective date of this Agreement by each employee of the Employer covered by this Agreement.  Payment shall be made monthly on or before the 20th day of the succeeding month.

(c).  The local industry fund shall furnish to the Business Manager of the Union, not less often than semi-annually, written reports describing in reasonable detail the nature of activities in which it is engaged or which it supports directly or indirectly with any of its funds.  One time per year, the local industry fund shall include in such written report, a statement attested to by a certified public accountant and containing its balance sheet and detailed statement of receipts and disbursements.  Further specific detailed information in regard to local industry fund activities or its receipts and/or disbursements shall be furnished to the Business Manager of the Union upon his written request.

8

(d).  Grievances concerning use of local industry fund monies to which an Employer shall contribute for purposes prohibited under Section 13(a) or for violations of other subsections of this Section shall be handled under the provisions of Article X of this Agreement.  The National Joint Adjustment Board shall be authorized to impose any remedial order for violation of this Section, including termination of the Employer's obligation to contribute to the local industry fund.

SECTION 14.  The Union and Employer recognize that the contributions provided in Sections 12(b) and 13(b) of this Article support activities that benefit the entire sheet metal industry.  It is essential that the Employer support these activities, even though it may be performing sheet metal work under the provisions of a separate project agreement or maintenance agreement.

Therefore, hours worked for purposes of determining the contributions required under Sections 12(b) and 13(b) of this Article shall include all hours worked by each employee of the Employer under any project agreement or maintenance agreement, unless specifically excluded by the terms of a written addendum that is negotiated by the Contractors' Association and the Local Union that are parties to this Agreement.

SECTION 15.  Effective as of the date of this Agreement, the Employer shall contribute to the International Training Institute for the Sheet Metal and Air Conditioning Industry (ITI) twelve cents ($0.12) per hour for each hour worked by each employee of the Employer covered by this Agreement.  In the event that such hourly contribution rate is changed during the term of this Agreement, such change shall become effective during the next anniversary date of this Agreement.  Payment shall be made on or before the 20th day of the succeeding month and shall be remitted as designated by the Trustees of ITI, or for the purposes of collection and transmittal electronically or through the Sheet Metal Workers National Benefit Funds.

Effective as of the date of this Agreement, the Employers shall contribute to the National Energy Management Institute Committee (NEMIC) three cents ($0.03) per hour for each hour worked by each employee of the Employer covered by this Agreement.  In the event that such hourly contribution rate is changed during the term of this Agreement, such change shall become effective during the next anniversary date of this Agreement.  Payment shall be made on or before the 20th day of the succeeding month and shall be remitted as designated by the Trustees of NEMIC, or for the purposes of collection and transmittal electronically through the Sheet Metal Workers National Benefit Funds.

Effective as of the date of this Agreement, the Employers shall contribute to the Sheet Metal Occupational Health Institute Trust (Institute) two cents ($0.02) per hour for each hour worked by each employee of the Employer covered by this Agreement until the Institute Trustees determine that the Trust is financially self-sufficient.  In the event that such hourly contribution rate is changed during the term of this Agreement, such change shall become effective during the next anniversary date of this Agreement.  Payment shall be made on or before the 20th day of the succeeding month and shall be remitted as designated by the Trustees of the Institute, or for purposes of collection and transmittal electronically through the Sheet Metal Workers National Benefit Funds.

The parties authorize the trustees of all National Funds (as defined below) to cooperatively establish uniform collection procedures to provide for efficient and effective operation of the various National Funds. The parties recognize that the National Funds can receive and process contribution reports and remittances electronically. The parties agree to encourage employers to utilize the electronic reporting and remittance system.

The parties agree to be bound by, and act in accordance with, the respective Plan Documents, Agreements and Declarations of Trusts and/or Trust Documents establishing or governing the International Training Institute for the Sheet Metal and Air Conditioning Industry, the National Energy Management Institute Committee, the Sheet Metal Occupational Health Institute Trust, and the Industry Fund of the United States, and to the extent that this Agreement requires contributions to the following funds, the Sheet Metal Workers' National Pension Fund, National Stabilization Agreement of the Sheet Metal Industry Trust Fund, Sheet Metal Workers' National Health Fund, Sheet Metal Workers' International Association Scholarship Fund, Sheet Metal Workers' National Supplemental Savings Plan (collectively, "National Funds"), as applicable and the separate agreements and declarations of trusts of all other local or national programs and benefit plans to which it has been agreed that contributions will be made. In addition, the parties agree to be bound by any amendments to said trust or plan documents as may be made from time to time and hereby designate as their representatives on the Board of Trustees such trustees as are named together with any successors who may be appointed pursuant to said documents.

SECTION 16. In the event that the Employer becomes delinquent in making contributions to any national or local Fund, the Union may withdraw all employees from the service of the Employer within 72-hours notice of such delinquency by the trustees. The withdrawal of such employees from the service of the Employer shall not constitute a violation of any provision of this Agreement.

SECTION 17(a). The Employer shall comply with any bonding provisions governing local Funds that may be negotiated by the local parties and set forth as a written Addendum to this Agreement. The Employer shall likewise comply with bonding requirements established by the Trustees of the National Funds, but in no event shall such bonds be in excess of three (3) months estimated contributions to local and national Fund.

(b). When an Employer is performing any work specified in Article I of this Agreement outside of the area covered by this Agreement, and within the area covered by another Agreement with a local union affiliated with the International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART), the Employer shall comply with uniformly applied bonding requirements of that local area that are reasonable and necessary to ensure the timely payment of any contribution that may be required to local and national Funds.

(c). An Employer that has been delinquent in making contributions to any national or local fund shall, upon written notification of the trustees or local union, make the specified payment to such fund at weekly intervals.

SECTION 18. The Employer and the Union understand that the Sheet Metal Workers' National Pension Fund ("NPF" or "Fund") has issued a Rehabilitation Plan under the Pension Protection

Act of 2006 and may in the future issue a Funding Improvement Plan under the Act. In addition, the NPF's Rehabilitation Plan or Funding Improvement Plan may provide for schedules which must be adopted by new or existing parties to this Agreement.

The parties agree that any schedule described above will be deemed to be adopted automatically if, in accordance with this Agreement, the Union allocates or reallocates a portion of the wage and fringe benefit package, or where the agreement provides for an automatic allocation or reallocation of the wage and fringe benefit package, that is sufficient to cover fully any increases in contribution rates to the pension fund that has issued that schedule.

It is undesirable to pay a surcharge upon pension contributions, or face other undesirable consequences for failure to adopt a schedule. Accordingly, in the absence of a reallocation as provided above, at such time as the pension fund(s) furnishes the Employer and the Union with schedules as provided above, either party may re-open this Agreement upon thirty days' notice to the other, for the purpose of reaching agreement upon the adoption of one of those schedules. During the negotiations, the parties shall give due recognition to the desirability of maintaining pension benefits in light of economic conditions in the local area.

The parties agree further that the schedule described above will become part of this agreement, and will be incorporated by reference herein, on the date the schedule is adopted or is deemed to have been adopted automatically in accordance with the terms above. The parties will not take any action or actions inconsistent with the NPF's Rehabilitation Plan or Funding Improvement Plan of which the schedules are a part, as modified or amended from time-to- time.

Effective July 1, 1997, the contribution rate to the National Pension Fund for all apprentices is based upon the same percentage as their wage rate.

See Addendum VIII.

# ARTICLE IX

SECTION 1. Journeymen, apprentice, and preapprentice sheet metal workers covered by this Agreement shall provide for themselves all necessary hand tools. The Union and the Employer shall establish a standardized tool list, which shall be set forth as a written addendum attached hereto.

SECTION 2. Journeymen, apprentice, and preapprentice sheet metal workers covered by this Agreement shall not be permitted or required as a condition of employment to furnish the use of automobile or other conveyance to transport men, tools, equipment or materials from shop to job, from job to job, or from job to shop; facilities for such transportation to be provided by the Employer. This provision shall not restrict the use of an automobile or other conveyance to transport its owner and personal tools from home to shop or job at starting time or from shop or job to home at quitting time.

See Addendum IX.

# ARTICLE X

The Union and the Employer, whether party to this Agreement independently or as a member of a multi-employer bargaining unit, agree to utilize and be bound by this Article.

SECTION 1.  Grievances of the Employer or the Union, arising out of interpretation or enforcement of this Agreement, shall be settled between the Employer directly involved and the duly authorized representative of the Union, if possible.  Both parties may participate in conferences through representatives of their choice.  The local Employers' Association or the Local Union, on its own initiative, may submit grievances for determination by the Board as provided in this Section.  The grievance procedure set forth in this Article applies only to labor-management disputes.

To be valid, grievances must be raised within thirty (30) calendar days following the occurrence giving rise to the grievance, or, if the occurrence was not ascertainable, within thirty (30) calendar days of the first knowledge of the facts giving rise to the grievance.

SECTION 2.  Grievances not settled as provided in Section 1 of this Article may be appealed by either party to the Local Joint Adjustment Board where the work was performed or in the jurisdiction of the Employer's home local and such Board shall meet promptly on a date mutually agreeable to the members of the Board, but in no case more than fourteen (14) calendar days following the request for its services, unless the time is extended by mutual agreement of the parties or Local Joint Adjustment Board.  The Board shall consist of an equal number of representatives of the Union and of the local Employers' Association and both sides shall cast an equal number of votes at each meeting.  Except in the case of a deadlock, a decision of a Local Joint Adjustment Board shall be final and binding.

Notice of appeal to the Local Joint Adjustment Board shall be given within thirty (30) days after termination of the procedures prescribed in Section 1 of this Article, unless the time is extended by a mutual agreement of the parties.

SECTION 3.  Grievances not disposed of under the procedure prescribed in Section 2 of this Article, because of a deadlock or failure of such Board to act, may be appealed jointly or by either party to a Panel, consisting of one (1) representative appointed by the Labor Co-Chairman of the National Joint Adjustment Board and one (1) representative appointed by the Management Co-Chairman of the National Joint Adjustment Board.  Appeals shall be mailed to the National Joint Adjustment Board*. Notice of appeal to the Panel shall be given within thirty (30) days after termination of the procedures prescribed in Section 2 of this Article. Such Panel shall meet promptly but in no event more than fourteen (14) calendar days following receipt of such appeal, unless such time is extended by mutual agreement of the Panel members.  Except in case of deadlock, the decision of the Panel shall be final and binding.

In establishing the grievance procedure of the Standard Form of Union Agreement, it was the intent of International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART) and the Sheet Metal and Air Conditioning Contractors' National Association, Inc. to establish a method for resolving grievances permitting appeals for out-of-area Employers from the grievance arbitration procedures established for the territory in which work is performed.  An

Employer who was not a party to the Labor Agreement of the area in which the work in dispute is performed may appeal the decision of the Local Joint Adjustment Board from that area, including a unanimous decision, as well as a decision of any alternative arbitration tribunal established for that area, and request a Panel hearing as set forth in Section 3 of this Article, providing such appeal is approved by the Co-Chairmen of the National Joint Adjustment Board.  Such a right of appeal shall exist despite any contrary provision in the agreement covering the area in which the work is performed.

For the purposes of this Section, an Employer who is party to the Labor Agreement of the area in which the work in dispute is performed, but has no permanent shop within the area served by the Local Joint Adjustment Board that rendered the unanimous decision, may also be entitled to appeal a deadlocked or unanimous Local Joint Adjustment Board decision, and request a Panel hearing.

SECTION 4.  Grievances not settled as provided in Section 3 of this Article may be appealed jointly or by either party to the National Joint Adjustment Board.  Submissions shall be made and decisions rendered under such procedures as may be prescribed by such Board. Appeals to the National Joint Adjustment Board shall be submitted within thirty (30) days after termination of the procedures described in Section 3 of this Article.  The Procedural Rules of the National Joint Adjustment Board are incorporated in this Agreement as though set out in their entirety.  (Copies of the procedures may be obtained from the National Joint Adjustment Board.*)

SECTION 5. A Local Joint Adjustment Board, Panel and the National Joint Adjustment Board are empowered to render such decisions and grant such relief to either party as they deem necessary and proper, including awards of damages or other compensation.

SECTION 6.  In the event of non-compliance within thirty (30) calendar days following the mailing of a decision of a Local Joint Adjustment Board, Panel or the National Joint Adjustment Board, a local party may enforce the award by any means including proceedings in a court of competent jurisdiction in accord with applicable state and federal law.  If the party seeking to enforce the award prevails in litigation, such party shall be entitled to its costs and attorney's fees in addition to such other relief as is directed by the courts. Any party that unsuccessfully challenges the validity of an award in a legal proceeding shall also be liable for the costs and attorneys' fees of the opposing parties in the legal proceedings.

SECTION 7.  Failure to exercise the right of appeal at any step thereof within the time limit provided therefore shall void any right of appeal applicable to the facts and remedies of the grievances involved.  There shall be no cessation of work by strike or lockout during the pendency of the procedures provided for in this Article.  Except in case of deadlock, the decision of the National Joint Adjustment Board shall be final and binding.

SECTION 8.  In addition to the settlement of grievances arising out of interpretation or enforcement of this Agreement as set forth in the preceding sections of this Article, any controversy or dispute arising out of the failure of the parties to negotiate a renewal of this Agreement shall be settled as hereinafter provided:

(a). Should the negotiations for a renewal of this Agreement or negotiations regarding a wage/fringe reopener become deadlocked in the opinion of the Union representative(s) or of the Employer('s) representatives(s), or both, notice to that effect shall be given to the National Joint Adjustment Board.

If the Co-Chairmen of the National Joint Adjustment Board believe the dispute might be adjusted without going to final hearing before the National Joint Adjustment Board, each will then designate a Panel representative who shall proceed to the locale where the dispute exists as soon as convenient, attempt to conciliate the differences between the parties and bring about a mutually acceptable agreement. If such Panel representatives or either of them conclude that they cannot resolve the dispute, the parties thereto and the Co-Chairmen of the National Joint Adjustment Board shall be promptly so notified without recommendation from the Panel representatives. Should the Co-Chairmen of the National Joint Adjustment Board fail or decline to appoint a Panel member or should notice of failure of the Panel representatives to resolve the dispute be given, the parties shall promptly be notified so that either party may submit the dispute to the National Joint Adjustment Board.

In addition to the mediation procedure set forth above or as an alternate thereto, the Co-Chairmen of the National Joint Adjustment Board may each designate a member to serve as a Subcommittee and hear the dispute in the local area. Such Subcommittees shall function as arbitrators and are authorized to resolve all or part of the issues. They are not, however, authorized to deadlock and the matter shall be heard by the National Joint Adjustment Board in the event a Subcommittee is unable to direct an entire resolution of the dispute.

The dispute shall be submitted to the National Joint Adjustment Board pursuant to the rules as established and modified from time to time by the National Joint Adjustment Board. The unanimous decision of said Board shall be final and binding upon the parties, reduced to writing, signed and mailed to the parties as soon as possible after the decision has been reached. There shall be no cessation of work by strike or lockout unless and until said Board fails to reach a unanimous decision and the parties have received written notification of its failure.

(b). Any application to the National Joint Adjustment Board shall be upon forms prepared for that purpose subject to any changes which may be decided by the Board from time to time. The representatives of the parties who appear at the hearing will be given the opportunity to present oral argument and to answer any questions raised by members of the Board. Any briefs filed by either party including copies of pertinent exhibits shall also be exchanged between the parties and filed with the National Joint Adjustment Board at least twenty-four (24) hours in advance of the hearing.

(c). The National Joint Adjustment Board shall have the right to establish time limits which must be met with respect to each and every step or procedure contained in this Section. In addition, the Co-Chairmen of the National Joint Adjustment Board shall have the right to designate time limits which will be applicable to any particular case and any step therein which may be communicated to the parties by mail, facsimile or telephone notification.

(d).  Unless a different date is agreed upon mutually between the parties or is directed by the unanimous decision of the National Joint Adjustment Board, all effective dates in the new agreement shall be retroactive to the date immediately following the expiration date of the expiring agreement.

SECTION 9.  Employers not contributing to the Industry Fund of the United States (IFUS) will be assessed a fee to be determined periodically by the Administrator of the National Joint Adjustment Board.  Proceeds will be used to reimburse IFUS for costs of arbitration under the provisions of Article X.

SECTION 10.  In addition to the settlement of disputes provided for in Sections 1 through 8 of this Article, either party may invoke the services of the NJAB to resolve disputes over the initial establishment or amendment of terms for specialty addenda, if the provisions of Article X have been adopted in their entirety, and without modification.

Such a dispute may be submitted upon the request of either party any time that local negotiations for such an agreement, or amendment thereof, have been unsuccessful.  Such a dispute shall be submitted to the NJAB pursuant to the rules as established and modified from time to time by said Board.  The unanimous decisions of said Board shall be final and binding upon the parties.  There shall be no strike or lockout over such a dispute.

SECTION 11.  In administering and conducting dispute resolution activities under the arbitration procedures of the Standard Form of Union Agreement, the National Joint Adjustment Board, the International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART), the Sheet Metal and Air Conditioning Contractors' National Association, Inc., and their representatives, are functioning as arbitrators and not as the representative of any entity that is party to such dispute.  Therefore, they shall enjoy all of the rights, privileges and immunities afforded to arbitrators under applicable law.

*All correspondence to the National Joint Adjustment Board shall be sent to the following address: National Joint Adjustment Board, P.O. Box 220956, Chantilly, VA  20153-0956, or 4201 Lafayette Center Drive, Chantilly, VA 20151-1219.

# ARTICLE XI

SECTION 1.  All duly qualified apprentices shall be under the supervision and control of a Joint Apprenticeship and Training Committee composed of an equal number of trustees, half of whom shall be selected by the Employer, and half by the Union.  There shall be a minimum of 4 trustees. Said Joint Apprenticeship and Training Committee shall formulate and make operative such rules and regulations as they may deem necessary and which do not conflict with the specific terms of this Agreement, to govern eligibility, registration, education, transfer, wages, hours, working conditions of duly qualified apprentices and the operation of an adequate apprentice system to meet the needs and requirements of the trade.  Said rules and regulations when formulated and adopted by the parties hereto shall be recognized as part of this Agreement.

SECTION 2.  The Joint Apprenticeship and Training Committee designated herein shall serve for the life of this Agreement, except that vacancies in said Joint Apprenticeship and Training Committee caused by resignation or otherwise, may be filled by either party hereto, and it is hereby mutually agreed by both parties hereto, that they will individually and collectively cooperate to the extent that duly qualified apprentices be given every opportunity to secure proper technical and practical education experience in the trade, under the supervision of the Joint Apprenticeship and Training Committee.

(a).  The parties will review the needs for specialized and skill-upgrade training and cooperate to establish necessary programs which will then be supervised by the Joint Apprenticeship and Training Committee.

SECTION 3.  It is the understanding of the parties to this Agreement that the funds contributed by signatory Employers to the International Training Institute and any Local Joint Apprenticeship and Training Fund (Local JATC) will not be used to train apprentices or journeymen who will be employed by employers in the Sheet Metal Industry not signatory to a collective bargaining agreement providing for contributions to the International Training Institute and a Local JATC.  Therefore, the trustees of the International Training Institute and Local JATC shall adopt and implement an Educational Loan Agreement Program which will require apprentices and journeymen employed by signatory Employers to repay the cost of training either by service following training within the union sector of the industry or by actual repayment of the cost of training if the individual goes to work for a non-signatory Employer in the Sheet Metal Industry.  The cost of training shall include the reasonable value of all International Training Institute and Local JATC materials, facilities and personnel utilized in training.  If a Local JATC does not implement the Educational Loan Agreement Program, the Local JATC shall be prohibited from utilizing International Training Institute materials and programs.

SECTION 4.  It is hereby agreed that the Employer shall apply to the Joint Apprenticeship and Training Committee and the Joint Apprenticeship and Training Committee shall grant apprentices on the basis of one (1) apprentice for each three (3) journeymen regularly employed throughout the year.  Provided, however, an Employer will not be entitled to a new apprentice if the Employer has an apprentice on layoff for lack of work.

SECTION 5.  Each apprentice shall serve an apprenticeship of up to five (5) years and such apprentices shall not be in charge of work on any job and shall work under the supervision of a journeyman until apprenticeship terms have been completed and they have qualified as journeymen.

SECTION 6.  A graduated wage scale for apprentices shall be established and maintained on the following percentage basis of the established wage rate of journeyman sheet metal workers:

> First Year – First half 45% - Second half 50%
> Second Year – First half 55% - Second half 60%
> Third Year – First half 65% - Second half 65%
> Fourth Year – First half 70% - Second half 75%
> Fifth Year – First half 80% - Second half 85%

This Section shall not have the effect of reducing the wage progression schedule of any apprentice who was indentured prior to the effective date of this Agreement.

SECTION 7.  The parties will establish on a local basis the SMART Youth-to-Youth program (the program) and the procedures to enable all apprentices to participate in the program. The activities of the program that deal with organizing and other traditional union activities shall be funded by the Local Union through a check-off in compliance with the provisions of Section 302(c) of the Labor-Management Relations Act of 1947.  Activities that may be funded by Employer contributions shall be so funded if, and to the extent, the parties shall agree locally to sponsor and implement the same.

SECTION 8.  The parties agree that day school apprenticeship training is preferable to night-schooling and urge the Joint Apprenticeship and Training Committee to continue day school training during the term of this Agreement.

The parties recognize that previous experience in the industry can be considered when evaluating and placing sheet metal workers into the apprenticeship program and the JATC shall work cooperatively with the parties in establishing standards for placing employees into the program.  The parties shall also address the need to provide continuity in health care for those workers entering the program with prior experience in the industry.

SECTION 9.  The parties agree that career-long skill upgrade training is necessary for an effective workforce and agree to undertake those measures available to them to encourage continuing training for sheet metal journeymen.

See Addendum XI.

# ARTICLE XII

SECTION 1. Sheet metal workers shall complete OSHA 30 training, as well as any mandatory refresher course, as a condition of employment in the sheet metal industry. Such training shall be completed on the employee's time.

The parties to this Agreement shall take appropriate steps to provide that the cost of any materials used in such training, as well as the costs associated with providing instruction, shall be paid for by the Local Joint Apprenticeship and Training Fund.

SECTION 2. The parties are committed to maintaining a workplace that is safe, productive, and free of alcohol and illegal drugs. Therefore, they shall establish a substance abuse program which will include, as a minimum, the following components: owner mandated, reasonable suspicion, post-accident, and random drug and alcohol testing. In the case of random testing, the procedures shall be established and administered in a manner so that such testing is conducted in a manner that is truly random. Any testing program shall be conducted on an industry wide basis, and in conformity with all applicable laws. The parties shall establish an appropriate means of funding such testing activities on an industry wide basis.

See Addendum VIII, Reference Article VIII, Section 10

# ARTICLE XIII

SECTION 1.  It is hereby agreed that the Employer may apply to the Joint Apprenticeship and Training Committee and the Joint Apprenticeship and Training Committee shall grant pre-apprentices on the basis of one (1) preapprentice for each three (3) apprentices employed by the Employer.  Provided, however, that an Employer who employs one (1) or more apprentices and at least three (3) sheet metal journeymen shall be entitled to at least one (1) preapprentice.  Any apprentice of the Employer on layoff at the effective date of this Agreement must be rehired before said Employer is entitled to any preapprentice.  Thereafter, the same conditions and ratios shall apply.

In the event the Employer is entitled to employ a preapprentice and the Union fails to comply with the Employer's written request to furnish a preapprentice within forty-eight (48) hours, the Employer may hire such employees and refer them to the Joint Apprenticeship and Training Committee for enrollment.

Preapprentices shall be enrolled as applicants for future openings in the apprenticeship program.  The Joint Apprenticeship and Training Committee shall evaluate the qualifications of preapprentices for such openings during the first year of employment.  No preapprentice shall be retained beyond one (1) year unless the preapprentice has been found to be qualified as an applicant by the JATC.

The wage scale for preapprentices shall be a minimum of forty percent (40%) of the wage rate of journeymen sheet metal workers.  After one year as a preapprentice in the industry, the wage scale shall be a minimum of forty percent (40%) of journeyman rate plus seventy-five cents ($0.75).  Health and welfare coverage shall be arranged on behalf of the preapprentices by the parties. After eighteen (18) months of continued employment with the same employer, local pension contributions shall be remitted at one third (1/3) of the current contribution rate.

# ARTICLE XIV

SECTION 1.   SMACNA and SMART are committed to promoting productive and cooperative labor-management relations.   In furtherance of this goal, the local Employers' association and the Local Union agree to establish a labor-management committee which shall meet on a regular basis, but not less often than quarterly, to discuss industry issues of mutual concern.  Such committees will strive to improve communications, understand and respond to industry direction and trends, and resolve common issues collaboratively.

## ARTICLE XV

SECTION 1.  In applying the terms of this Agreement, and in fulfilling their obligations there under, neither the Employer nor the Union will discriminate in any manner prohibited by law.

# ARTICLE XVI

SECTION 1.  This Agreement and Addenda Numbers I through XVII attached hereto shall become effective on the first day of July, 2023 and remain in full force and effect until the thirtieth day of June, 2026 and shall continue in force from year to year thereafter unless written notice of reopening is given not less than ninety (90) days prior to the expiration date.  In the event such notice of reopening is served, this Agreement shall continue in force and effect until conferences relating thereto have been terminated by either party by written notice, provided, however, that, if this Agreement contains Article X, Section 8, it shall continue in full force and effect until modified by order of the National Joint Adjustment Board or until the procedures under Article X, Section 8 have been otherwise completed.

SECTION 2.  If, pursuant to federal or state law, any provision of this Agreement shall be found by a court of competent jurisdiction to be void or unenforceable, all of the other provisions of this Agreement shall remain in full force and effect.  The parties agree to meet and negotiate a substitute provision.  If negotiations are unsuccessful, the issue may be submitted for resolution by either party pursuant to Article X, Section 8 of this Agreement.

SECTION 3.  Notwithstanding any other provision of this Article, or any other Article of this Agreement, whenever an amendment to the Standard Form of Union Agreement shall be adopted by the sponsoring national associations, any party to this Agreement, upon the service of notice to all other parties hereto, shall have this Agreement reopened thirty (30) days thereafter, for the sole and only purpose of attempting to negotiate such amendment or amendments into this Agreement for the duration of the term hereof.  There shall be no strike or lockout over this issue.

SECTION 4.  Each Employer hereby waives any right it may have to repudiate this Agreement during the term of this Agreement, or during the term of any extension, modification or amendment of this Agreement.  This shall be effective during the entire term of any collective bargaining agreement that has been entered into under Section 8(f) of the National Labor Relations Act, and upon conversion of the bargaining relationship to one under Section 9(a) of the National Labor Relations Act, either by an election conducted by the National Labor Relations Board, or through the procedures set forth in this Agreement.

SECTION 5.  By execution of this Agreement the Employer authorizes Northern Indiana Sheet Metal Contractors' Association, Inc. to act as its collective bargaining representative for all matters relating to this Agreement.  The parties agree that the Employer will hereafter be a member of the multi-employer bargaining unit represented by said Association unless this authorization is withdrawn by written notice to the Association and the Union at least one hundred fifty (150) days prior to the then current expiration date of this Agreement.

In witness whereof, the parties hereto affix their signatures and seal this

_____*18*_____ day of _____*JUNE*_____, 20 *21*

THIS STANDARD FORM OF UNION AGREEMENT HAS PROVIDED FOR THE INCLUSION OF PREAPPRENTICES AND A REDUCTION OF THE WAGE SCHEDULE FOR NEW APPRENTICES. THE PURPOSE OF THIS IS TO MAKE CONTRACTORS MORE COMPETITIVE WITH NON-UNION COMPETITION. TO ACHIEVE THAT OBJECTIVE EMPLOYERS AGREE TO MINIMIZE MULTIPLE MARKUPS.

**The Standard Form of Union Agreement is a recommended contract form that is revised from time to time by the International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART) and the Sheet Metal and Air Conditioning Contractors' National Association, Inc. In establishing such a recommended contract form, neither the International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART), nor the Sheet Metal and Air Conditioning Contractors' National Association, Inc. has acted as the bargaining representative of any entity that may adopt all or part of the language of the Standard Form of Union Agreement. Furthermore, neither the International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART) nor the Sheet Metal and Air Conditioning Contractors' National Association, Inc., shall be deemed to be a party to any such collective bargaining agreement including such language.**

*STI HEATING & AIR CONDITIONING*Local Union No. 20 of International
(Specify Name of Association or Contractor)    Association of Sheet Metal, Air, Rail and Transportation Workers (SMART)

By _____    By _____
(Signature of Officer or Representative)      (Signature of Officer or Representative)

_____    _____

_____    _____

_____    _____

# ADDENDUM I
## REF:  ARTICLE I

SECTION 1.  The parties understand that it is an impossible task to spell out in complete detail the work of the bargaining unit. Accordingly, even though specific work may not be specifically spelled out it will nevertheless be considered as and treated as part of the bargaining unit work if it has been traditionally performed by bargaining unit employees and this shall apply irrespective of any new methods, processes or materials which are used as a substitute for other methods of performing the work.  In such latter instance the work shall nevertheless be considered bargaining unit work.  The bargaining unit herein consists of a single multi-employer unit consisting of all of the employees engaged in the work described herein in the territory covered by this Agreement working for the Employer Members of the Association and those Employers who have signed this Agreement and by the execution of same have agreed to be part of the single bargaining unit.

SECTION 2.  EMPLOYER QUALIFICATIONS:

(a)     The Employer agrees to carry unemployment insurance regardless of the number of men he employs.  All unemployment compensation payments are to be filed with the Indiana State Employment Security Division.

(b)     The Employer shall carry Workmen's Compensation Insurance on all employees and shall furnish the Union with a certificate indicating such coverage.  Such certificate shall be current and shall be furnished to the Union at least annually. The failure to carry Workmen's' Compensation and to furnish the Union with a certificate shall be grounds for immediate cancellation of the Agreement on the part of the Union by giving a 72-hour written notice to the Employer.  All workmen shall promptly report all accidents to the Employer in accordance with the requirements of insurance companies and the State Industrial Board.

If anytime during the term of this Agreement, assuming both parties to this Agreement agree to do so, it will be deemed permissible to enter into a "collectively bargained Workman's Compensation Insurance Program" in lieu of the insurance coverage specified above.

(c)     Each Employer signatory to this Agreement agrees to maintain a place of business in accordance with applicable zoning regulations for his type of operation and agrees to maintain proper and safe equipment necessary for his particular operation.  He further agrees to maintain all licenses required by state, federal and municipal governments, which are pertinent to his business.

(d)     All signators agree to identify all commercial type vehicles used in the operation of their business by placing the company's name and address on each side of any such vehicle, using easily readable letters.

(e)     All signators installing residential heating and/or cooling agree to identify such installations by placing on the equipment a permanent or semi-permanent type sign indicating the name, address and telephone number of their company.

(f)     One (1) journeyman sheet metal worker shall be employed the major part of the year.

(g)     Employer agrees to recognize the right of the Union or its representative to appoint a Steward; whose duty shall be to see that all employees covered by this Agreement are members of the Union, and in good standing in accordance with the requirements of this Agreement.

(h)     The Business Manager or Business Agent of the Union shall not be denied access to the Employer's office or any part of the shop or projects for the transaction of business with the Employer or employees covered by this Agreement.

(i)     Owner-members shall be required to pay all Funds on their own behalf equal to 140 hours per month or actual hours worked, whichever of the two is greater.

SECTION 3.  The Employer and the Union will jointly make every effort to have the Architects and/or Engineers include in the Sheet Metal sections all items belonging within our Industry to fabricate and/or install.

(a)     The Employer shall make every effort to bid any item on any job belonging to the sheet metal industry even though it may require him to obtain subbids from other signed Sheet Metal Employers to accomplish the fabrication and/or installation of the complete job required by job specification.  The Employer shall notify the Union when his bid has been refused because he has included the furnishing, handling, installing of all items belonging to the sheet metal industry.

(b)     The Business Manager and Agents of the Union will be furnished prints and specifications of the jobs if the information is public and available.  Local No. 20 will bear all cost of reproduction.

SECTION 4.  The Employer recognizes the Union as the sole and exclusive collective bargaining representative for the employees engaged in the work set forth in Section 1 hereof (which shall constitute the bargaining unit), with respect to wages, hours of work and all other items and conditions of employment.  The Union recognizes the Northern Indiana Sheet Metal Contractors Association, Inc. as the bargaining agency for the members of said Association with respect to wages, hours of work and all other terms and conditions of employment.  (However, in the event a petition is filed with the NLRB, either before or after the expiration of this Agreement, the Union and the Employer (including any Employer assenting to this Agreement subsequent to its effective date) agree that the appropriate bargaining unit shall consist of all employees of all Employers signatory to this Agreement.)

# ADDENDUM II
## REF: ARTICLE II

SECTION 1.  All sheet metal work manufactured, assembled and fabricated outside jurisdiction of Local Union No. 20 by members of the International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART) for installation within the jurisdiction of Local No. 20 shall bear the Sheet Metal Workers' Union Label.  The Union and Association will jointly publicize and submit to the Contractors the names of firms and companies under agreement with Local Unions affiliated with the International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART) who manufacture products bearing the Union Label of the International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART).

SECTION 2 (a).  INTEGRITY CLAUSE.  A "bad-faith employer" for purposes of this Agreement is an Employer that itself, or through a person or persons subject to an owner's control, has ownership interests (other than a noncontrolling interest in a corporation whose stock is publicly traded) in any business entity that engages in work within the scope of SFUA Article I hereinabove using employees whose wage package, hours and working conditions are inferior to those prescribed in this Agreement or if such business entity is located or operating in another area, inferior to those prescribed in the Agreement of the sister local union affiliated with International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART), AFL-CIO in that area.

An Employer is also a "bad-faith employer" when it is owned by another business entity as its direct subsidiary or as a subsidiary of any other subsidiary within the corporate structure thereof through a parent-subsidiary and/or holding-company relationship, and any other business entity within such corporate structure is engaging in work within the scope of SFUA Article I hereinabove using employees whose wage package, hours and working conditions are inferior to those prescribed in this Agreement or, if such other business entity is located or operating in another area, inferior to those prescribed in the Agreement of the sister local union affiliated with International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART), AFL-CIO in that area.

(b). Any Employer that signs this Agreement or is covered thereby by virtue of being a member of a multi-employer bargaining unit expressly represents to the Union that it is not a "bad-faith employer" as such term is defined in SECTION 2 (a) hereinabove and, further agrees to advise the Union promptly if at any time during the life of this Agreement said Employer changes its mode of operation and becomes a "bad-faith employer."  Failure to give timely notice of being or becoming a "bad-faith employer" shall be viewed as fraudulent conduct on the part of such Employer.

In the event any Employer signatory to or bound by this Agreement shall be guilty of fraudulent conduct as defined above, such Employer shall be liable to the Union for liquidated damages at the rate of $500 per calendar day from the date of failure to notify the Union until the date on which the Employer gives notice to the Union.  The claim for liquidated damages shall be processed as a grievance in accordance with, and within the time limits prescribed by, the provisions of Standard Form of Union Agreement, Article X.

SECTION 3.  WORK PRESERVATION CLAUSE:

Part One.  Double-Breasted Operation within the Geographic Area Covered by this Agreement.

(a) Jobsite Work:  The Employer agrees that no evasion of the terms, requirements, and provisions of this Agreement, will take place by the setting up of another business to do jobsite work covered by this Agreement, or in any other way attempt to or actually evade or nullify responsibility hereunder.  If and when the Employer shall perform any jobsite work of the type covered by this Agreement, under its own name or under the name of another, as a corporation, company, partnership, joint venture, or any other business entity (hereinafter referred to as the "non-signatory entity"), wherein the Employer through its officers, directors, partners, stockholders, or participation, exercises either directly or indirectly, control of the work of the non-signatory entity, the terms and conditions of this Agreement shall be applicable to all such jobsite work.

In the event that the conditions set forth in the paragraph above are met but the Agreement is not deemed applicable to the non-signatory entity, then the Employer shall be liable to the Union for all damages which shall include all hours of work performed outside the labor contract by employees of the non-signatory entity and shall include deterrent damage which may be awarded.  All such damages shall be payable to the Union for appropriate distribution in a manner consistent with the law.

This subsection (a) is applicable only to jobsite work as that term is used in Construction Industry Proviso to Section 8 (e) of the National Labor Relations Act.  This clause (a) is not applicable to non-jobsite work.

(b) Non-Jobsite Work:  The Employer agrees that no evasion of the terms, requirements, and provisions of this Agreement will take place by the setting up of another business to do non-jobsite work covered by this Agreement, or in any other way attempt to or actually evade or nullify responsibility hereunder.  If and when the Employer shall perform any non-jobsite work of the type covered by this Agreement, under its own name or under the name of another, as a corporation, company, partnership, joint venture, or any other business entity (hereinafter referred to as the "non-signatory entity"), wherein the Employer through its officers, directors, partners, stockholders, or participation, exercises either directly or indirectly, control of the work of the non-signatory entity, the non-signatory entity shall observe only the equivalent of the economic terms of this Agreement, and the Employer shall provide monthly reports to the Union sufficient to verify that the non-signatory entity has complied with this requirement as to economic terms.  Failure to comply with this paragraph shall subject the Employer to penalties sufficient to deter violation.

Part Two.  Double-Breasted Operations outside the Geographic Area Covered by this Agreement.

(a) Jobsite Work:  The Employer agrees that no evasion of the terms, requirements, and provisions of this Agreement will take place by the setting up of another business to do jobsite work covered by this Agreement, or in any other way attempt to or actually evade or nullify responsibility hereunder.  If and when the Employer shall perform any jobsite work of the type covered by this Agreement, under its own name or under the name of another, as a corporation, company, partnership, joint venture, or any other business entity (hereinafter referred to as the "non-signatory entity"), wherein the Employer through its officers, directors, partners, stockholders, or participation, exercises either directly or indirectly, control of the work of the non-signatory entity, the terms and conditions of this Agreement shall be applicable to all such jobsite work.

In the event that the conditions set forth in the paragraph above are met but the Agreement is not deemed applicable to the non-signatory entity, then the Employer shall be liable to the Union for all damages which shall include all hours of work performed outside the labor contract by employees of the non-signatory entity and shall include deterrent damage which may be awarded.  All such damages shall be payable to the Union for appropriate distribution in a manner consistent with the law.

This subsection (a) is applicable only to jobsite work as that term is used in Construction Industry Proviso to Section 8 (e) of the National Labor Relations Act.  This clause (a) is not applicable to non-jobsite work.

(b) Non-Jobsite Work:  The Employer agrees that no evasion of the terms, requirements, and provisions of this Agreement will take place by the setting up of another business to do non-jobsite work covered by this Agreement, or in any other way attempt to or actually evade or nullify responsibility hereunder.  If and when the Employer shall perform any non-jobsite work of the type covered by this Agreement, under its own name or under the name of another, as a corporation, company, partnership, joint venture, or any other business entity (hereinafter referred to as the "non-signatory entity"), wherein the Employer through its officers, directors, partners, stockholders, or participation, exercises either directly or indirectly, control of the work of the non-signatory entity, the non-signatory entity shall observe only the equivalent of the economic terms of this Agreement, and the Employer shall provide monthly reports to the Union sufficient to verify that the non-signatory entity has complied with this requirement as to economic terms.  Failure to comply with this paragraph shall subject the Employer to penalties sufficient to deter violation.

SECTION 4.  PROTECTION OF PREVAILING WAGES AND CONDITIONS OF UNIT WORK.

(a) The Employer is in the construction industry and both parties have elected to come under the proviso applicable to the construction industry contained in Section 8 (e) of the National Labor Relations Act, as amended.

(b) The Employer shall perform no work, and if it has commenced work shall cease work on any job in which any employee of any other Employer not covered by a collective bargaining agreement with a union having a collective bargaining agreement as to wages, hours and conditions of employment at least equal to in all respects as a union affiliated with the Building Trades Department of the AFL-CIO, or with a Building and Construction Trades Council in turn affiliated with the AFL-CIO is working.

(c) SECTIONs 4(a) and 4(b) of this Article relate solely to contracting or sub-contracting of work to be done at the site of the construction, alteration, painting or repair of a building structure or other work.

(d) In the event the Employer finds it necessary or advisable to subcontract any of his work, he shall do so only in accordance with the following conditions.

(1) Preservation of Bargaining Unit Work.  In order to preserve the bargaining unit work for employees in the bargaining unit, only such employees, and no one else shall perform all of the work covered by this Agreement.

(2) The purpose of this section relative to sub-contracting is to attempt to assure that the wages and working conditions prevailing in the area where the work is to be performed, are maintained at the highest standard with no encroachments thereon.  In this connection, it is understood that the Union has no desire to impose its exclusive representation upon employees of the Employer to whom the work may be sub-contracted, but the Union and the instant Employer are only desirous of maintaining prevailing wages and conditions.

(3) The foregoing shall be interpreted, construed and applied in a manner consistent with the laws of the State of Indiana and of the United States and not in conflict thereof.

**ADDENDUM III**
**REF: ARTICLE III, SECTION 1**

**WORK TO BE PERFORMED STATEMENT**

**Date:**

**Project Name and Address:**                                    **Type of Project:**

_____          ☐ Commercial
                                                          ☐ Industrial
_____          ☐ Institutional
                                                          ☐ Residential
_____          ☐ Utility
                                                          ☐ Other
_____

**Awarding Authority:**

☐ General Contractor          ☐ Owner
☐ Mechanical Contractor       ☐ Other

**The following checked items are applicable to the above jobs and have been assigned to sheet metal workers:**

| **Architectural:** | **Miscellaneous:** | |
|---|---|---|
| ☐ Ceiling | ☐ Air Slides | ☐ Kitchen Equipment |
| ☐ Cornice | ☐ Airveyors | ☐ Laboratory Equipment |
| ☐ Draft Curtains | ☐ Clean Rooms | ☐ Lagging |
| ☐ Fascia | ☐ Conveyors | ☐ Lockers |
| ☐ Fire Curtains | ☐ Dryers | ☐ Ovens |
| ☐ Louvers | ☐ Dust Control Systems | ☐ Pneumatic Conveyors |
| ☐ Partitions | ☐ Enclosures | ☐ Shelving |
| ☐ Roof Decking | ☐ Fume Control Systems | ☐ Spray Booths |
| ☐ Roofing | ☐ Gravity Chutes | ☐ Storage Bins |
| ☐ Siding | ☐ Guards (Machines, etc.) | ☐ Toilet Partitions |
| ☐ Skylights | ☐ Industrial Fans | |
| ☐ Soffits | | |

| **Solar:** | **HVAC:** | |
|---|---|---|
| ☐ Collectors | ☐ Air Light Troffers | ☐ Mixing Boxes |
| ☐ Systems | ☐ Air Troffers | ☐ Strip Line Diffusers |
| ☐ Supports | ☐ Convector Covers | ☐ Terminal Reheat Boxes |

_____
Signature of Authorized Company Representative

27

# ADDENDUM III
## REF:  ARTICLE III

SECTION 2.  UNION SECURITY

(a)  All employees who are or become members of the Union shall maintain their membership in the Union as a condition of continued employment.

(b)  Members of the Union who fail to maintain their membership in the Union shall, upon request of the Union, be discharged.

(c)  The provisions of this Article shall be interpreted in a fashion consistent with federal law.

(d)  In accordance with the policy set forth under Sections 1 and 2 of this Article, all employees shall, as a condition of continued employment pay to the Union the employee's exclusive collective bargaining representative an amount of money equal to that paid by other employees in the bargaining unit who are members of the Union, which shall be limited to an amount of money equal to the Union's regular and usual initiation fees and its regular and usual dues.  For existing employees, such payments shall commence seven (7) days following the date of execution of this Agreement and for new employees, the payment shall start seven (7) days following the date of employment.

(e)  The Employer agrees to hire new employees through the Union.  In the event employees are required, the Employer shall so notify the Union.  Should the Union be unable within forty-eight hours to furnish the Employer with employees who are qualified for the work to be done, the Employer may secure such employees as are available and are acceptable to the Union.  The Union shall issue temporary cards to such employees otherwise secured until such time as the Union can provide qualified workmen.  When the Union becomes able to provide qualified workmen, such temporary employees shall be replaced by such qualified workmen.

(f)  Membership and good standing in the Union shall be determined solely by the Union.  The Employer agrees to respect and abide by the Union's determinations in this respect.

SECTION 3.  Work to Be Performed.  Only the employees in the bargaining unit shall perform the work covered by this Agreement except that the Employer himself can assist in the performance of work in his own shop in the presence of a journeyman at all times.

SECTION 4.  The Employer agrees to complete and provide to the Union a "Report of Construction Contractor's Wage Rates", Form WD-10 of the U.S. Department of Labor, upon request of the Union where necessary to assist the Union in providing input to state, county and/or local "prevailing wage" determinations.

# ADDENDUM IV
## REF: ARTICLE IV

SECTION 2.  (a).  The Employer agrees not to discriminate against employees because of age when hiring or terminating employment.

(b).  When any employee is laid off, the Business Manager, Business Agent or Business office shall be notified in advance.  This notification does not apply when layoff is due to inclement weather.

(c).  Employees who are laid off or discharged shall be allowed sufficient time to gather their tools and personal belongings so that they may be off the jobsite at regular quitting time.

(d).  When an Employer requires employees to use a time card, clock or other time checking device, the employee shall be allowed five minutes on company time in which to check out.

(e).  All payroll stubs shall show the hours worked and all withholding deductions.  All expenses and mileage shall be listed as such.

(f).  When an employee is going to be sent to a special agreement jobsite, the Employer or Union Representative shall make every effort to notify the employee one (1) day in advance that he is going to be sent to the project.

SECTION 3.  The Employer shall hire from the unemployed list of the Local Union only.

(a).  The Employer reserves the right to hire any unemployed person whose name is on the unemployed list.  The Employer agrees to submit a written request to the Union for such person.

(b).  No employee will be employed unless a referral slip from the Local Union office is presented to the Employer which has been signed by a Local Union Business Representative.

(c).  The parties agree that it is a violation of this agreement for any work stoppage, work slowdown, or refusal to work to occur as a result of any employee exercising his/her rights under the Indiana Right-to-Work Statute. The union agrees that it will not support, condone or encourage its members to take any such actions or to refuse to work with someone exercising his/her rights under the Indiana Right-to-Work Statute. The union further agrees that if one or more of its members engages in such activities the union will promptly direct them to cease violating the collective bargaining agreement and to return to work as normal immediately. The parties agree that any employee refusing to work with someone exercising his/her rights under the Indiana Right-to-Work Statute after being directed to return to work may be terminated immediately.

(d).  The Union agrees to hold harmless and to indemnify any Employer, its respective owners, managers, partners, subsidiaries, affiliates, officers, directors, employees and agents from a claim for back pay, fines, governmental charges, penalties or other damages arising out of the Union's unlawful application of its referral rules/practices provided, however, that an Employer shall be solely responsible for its violations of employment discrimination statutes and other applicable laws in regards to employees dispatched by the Union.

(e).  The Union further agrees to reimburse any Employer for costs and attorney fees incurred in defending a claim alleging a violation of the Indiana Right-to-Work Statute provided that the Employer is found to have violated the Indiana Right-to-Work law and that the Union has been determined to have required that the Employer take this unlawful action. The Union's liability under this subsection only applies after a decision by a Court of last resort or the Union elects not to pursue any further appeals.

(f).  This section shall survive any termination or expiration of this Agreement provided that the Employer remains signatory to the subsequent multi-employer Agreement between the Association and the Union.

## ADDENDUM V
## REF:  ARTICLE V

SECTION 1(a).  Working Dues Check-Off:  The Employer agrees to deduct, for the period of this Agreement and upon receipt of written authorization from each employee of the Employer, from the net wages of each employee, initiating such authorization, the sum specified through the written authorization for a working dues check-off.  It is clearly understood that the sum per payroll hour deduction is in addition to the members' regular dues.  (All such monies thus withheld shall be deposited by the 20th of each month, for the previous months withholding at the depository designated by the Local Union.  All such monies deposited will be credited by the depository to Local Union No. 20 account.)  The Union shall indemnify and save the Employer harmless against any and all claims, demands, lawsuits or other forms of liability that may arise out of or by reason of action taken by the Employer in making payroll deductions as herein provided.  This paragraph does not obligate the Employer to collect monthly dues-only working dues check-off, except when agreed to by additional Addendum or contract.

SECTION 2 (a).  The parties to this Agreement agree to fully comply with all of the provisions of Title VII of the Civil Rights Act of 1964, Presidential Executive Order 11246, Vietnam Era Veterans Readjustment Act of 1974 and the Indiana Fair Employment Act with respect to selection, training and employment of apprentices and trainees; to the referral practices in connection with applicants for employment; and to all employment practices; (including job promotion and working conditions with respect to all workers and supervisory employees), to the end that no discrimination shall be practiced in respect to age, sex, religion, race, color, mental or physical handicap, or national origin.

As used in this document, the terms "he", "his" or similar masculine pronouns shall be construed to include the feminine alternatives of such pronouns.  Such terms are used solely for

grammatical purposes and shall not be construed to limit this contract or its application on the basis of sex, race, national origin or any other classifications.

(b).  The Employer agrees that it shall not be a violation of any term, provision or requirement of this Agreement if employees covered by this Agreement refuse to cross or work behind any legal picket line established by any bona-fide union, provided the strike or picket line is authorized or sanctioned by the Union involved or by the International Union of the Union that called the strike or established the picket line or is authorized or sanctioned by a Central Labor, Building and Construction Trades, Metal trades or other recognized Council of Unions having jurisdiction of the area involved.  No employee covered by this Agreement shall be requested or required to perform any work operations that were being performed by persons on strike.

# ADDENDUM VI
## REF: ARTICLE VI

SECTION 1.  The regular workday shall consist of eight (8) continuous hours of labor in the shop or on the job between 6:00 A.M. and 6:00 P.M.  This starting time is to be used when mutually agreed upon by the Employer, the employee and the Union Representative.

SECTION 2.  Any work performed on Saturdays in excess of ten (10) hours or Sundays shall be recognized as holidays and shall be paid accordingly.

SECTION 3.  It is agreed that on architectural work in the field only employees may be allowed to work Saturday as a make-up day, due to inclement weather, of any particular day of that same week for regular straight time pay up to and including eight (8) hours provided:

(a)  The Union, employee and the Employer must agree.

(b)  It will not be a condition of employment for an employee to work Saturday as a make-up day.

SECTION 4.  A work week of four (4) ten (10) hour days, Monday through Thursday with Friday as a make-up day, will be permitted when approved by mutual agreement of the Union, employee(s) and the Employer and subject to the following rules:

(a)  The four (4) scheduled ten (10) hour days shall be paid at regular straight time wages.

(b)  All hours worked over ten (10) hours per day or over forty (40) hours per week shall be paid at the regular overtime rate of time and one half.

(c)  It will not be a condition of employment for an employee to work Friday as a make-up day. However, if an employee voluntarily chooses to work a Friday make-up day, the employee shall receive a minimum of eight (8) hours work offered for that day.

(d)  If a contractually recognized holiday is worked under this Section, employees shall be paid double time.

SECTION 5.  It is agreed that the Employer when business so demands may have the privilege of operating by utilizing more than one shift.  Not more than one shift shall be allowed on a job of less than five (5) days duration unless authorized by the area Business Agent which shall be determined by mutual consent of both the Employer and the Union prior to the institution of shift work, the Employer shall notify the Union at least 48 hours prior to the commencement of shift work.  In the event the Employer elects to institute shift work, the second shift shall commence at 4:00 P.M. and end at 12:30 A.M. and the third shift shall commence at 12:00 A.M. and end at 8:30 A.M.; provided that one-half hour is given for lunch. When mutually agreed upon between the Employer and the Union, shift work will be allowed in the shop at 1.07 times the regular rate for the first three weeks of the shift and 1.05 times the regular rate for the fourth and remaining weeks until the end of the shift. Shift work in the field shall be paid at 1.10 times the regular rate. Overtime for those employees required to work the second or third shifts

shall be computed on the basis of the premium wage provided for shift work and shall be governed by the provisions herein applicable to the regular shift, provided, however that for work performed during the second or third shifts on Sundays or on holidays recognized under this Agreement or on days celebrated as such, double time based upon the shift differential herein established shall be paid.  No employee shall be required to work at night unless at least six (6) hours will have elapsed between his day work assignment and the night work assignment.  No employee shall suffer a loss of working pay as a result of shift work that would reduce his working pay below forty, (40) hours for the week.

## SHIFT WORK EXAMPLES

## SHIFT WORKWEEK DAYS-SHOP

Day Shift:  8 hours at regular pay; over 8 hours, time and one half.
Second Shift:  8 hours at regular rate, plus 7% premium; over 8 hours, time and one half, plus 7% premium on total hours paid.
Third Shift:  Same as second shift.

EXAMPLE (1) Three shifts, weekdays only:

Day shift:  8 a.m. – 4:30 p.m. – 8 hours regular pay
2nd shift:  4 p.m. – 12:30 a.m. – 8 hours regular pay, plus 7% (5% after 3 weeks)
3rd shift:  12:01 a.m. – 8:30 a.m. – 8 hours regular pay, plus 7% (5% after 3 weeks)
The third shift does not work Friday.  This shift starts at 12:01 midnight Sunday.

EXAMPLE (2) Two 10 - hour shifts, week days only:

Day shift:  8:00 a.m. – 6:30 p.m. – 8 hours regular pay, 2 hours at time and one-half
Night shift:  6:30 p.m. – 5:00 a.m. – 8 hours regular pay, 2 hours at time and one-half, plus 7% premium on total hours paid.

SATURDAY

Day shift: 10 hours at time and one-half; over 10 hours – double time
Second shift:  10 hours at time and one-half; over 10 hours at double time, plus 7% on total hours paid. (5% after 3 weeks)
Third shift:  10 hours at time and one-half; over 10 hours at double time, plus 7% on total hours paid. (5% after 3 weeks)

SUNDAY:  All hours at double time.  Second and third shift, 7% on all hours paid.  Whatever time a shift starts determines the day of that shift. (5% after 3 weeks)

EXAMPLE (3) A 10 hour shift starting Friday at 8:00 a.m. and running to 6:30 p.m. is all first shift and paid as 8 hours regular time and 2 hours at time and one-half.

The second 10 hour shift on Friday starting 6:30 p.m. and running to 5:00 a.m. (Saturday) is deemed all Friday time and paid as 8 hours regular time and 2 hours at time and one-half, totaling 11 hours pay, plus 7% premium on all hours paid.

EXAMPLE (4) Saturday night shift running into Sunday a.m. is deemed Saturday time and Sunday time running into Monday a.m. is deemed Sunday time.

The above examples indicate starting time of the day shift at 8:00 a.m.  Starting time can be anytime agreed upon with the Union Business Agent.  The second and third shifts start at the end of the prior shift or may overlap.

FIELD WORK:  Wherever 7% is shown above, the premium for fieldwork will be 10%

# ADDENDUM VII
## REF: ARTICLE VII

SECTION 1(a).  The regular working day of eight (8) hours shall be established on all jobs regardless of location.

SECTION 1(b).  Expense Free Zone:  All jobs within fifty (50) miles from the shop or employee's residence-whichever is closer to the job according to an internet mapping program such as Google – shall be considered a "free zone" and no transportation expense paid.  A sixty-five (65) mile "free zone" exists when an employee is riding in a company vehicle.  Beyond the free zone and up to eighty (80) miles from the shop or employee's residence-whichever is closer to the job—mileage allowance shall be the current IRS allowable per mile rate.

Regardless of starting point, type of vehicle or means of travel, all projects located within the geographical area covered by SMART Local Union No. 20 Gary Area shall be considered "free zone."

SECTION 1(c).  For work beyond eighty (80) miles from the shop or employee's residence - whichever is closer to the job - the employee shall be paid at the rate of one hundred and twenty-five ($125.00) dollars for each night stayed abroad during travel.  After forty (40) hours worked in a given week, the employee shall be paid on a seven (7) day basis regardless of the number of nights stayed.

During traveling beyond eighty (80) miles, one (1) round trip is allowable and shall be compensated at the current I.R.S. allowable per mile (less the expense free zone) at the beginning and end of each continuous period of employment.

SECTION 1 (d)  The contractor may elect to pay travel expense in lieu of subsistence.

SECTION 1 (e)  For contractors who have an established place of business outside the jurisdictional area of Local 20 (Gary Area), travel expenses shall be the same as stated in Article VII, Section 2.  The starting point for calculating mileage shall be SMART  Local Union No. 20 Union Hall, 6450 Ameriplex Drive, Portage, IN.

SECTION 1 (f)     In the event transportation is necessary to go to a second location during working hours and the employee uses his own vehicle because Employer transportation is not available, he shall be compensated for such transportation at the current IRS allowable per mile rate between locations.

# ADDENDUM VIII
## REF:  ARTICLE VIII

## Gary Area Wage Rates:  Journeyman (A)

SECTION 1 (a)

|  | 7/1/2023 | 7/1/2024 | 7/1/2025 |
|---|---|---|---|
| Basic Wage | $47.60 | * | ** |
| Credit Union (Deduct)………. | (1.00) | | |
| Working Dues Check-off (Deduct)….. | (2.32) (1st 40 Hours Per Week) | | |
| 401 (a) Plan | 1.50 | | |
| Health & Welfare | 10.40 | | |
| Local Pension | 7.52 | | |
| National Pension | 6.49 | | |
| SASMI | 2.21 | | |
| | | | |
| TOTAL WAGE | $75.72 | | |
| | | | |
| Local Education Fund | 1.01 | | |
| I T I     (.12) | | | |
| NEMIC (.03) | | | |
| Asbestos (.02) | | | |
| Scholarship (.01) | .18 | | |
| E A P | .15 | | |
| Labor Trust | .06 | | |
| Industry Fund (Local .25 & SMACNA .13) | .38 | | |
| | | | |
| TOTAL | $77.50 | | |

*Effective July 1, 2024, $3.30 increase to wage and benefits to be determined.
**Effective July 1, 2025, $3.50 increase to wage and benefits to be dertermined.

Effective July 1, 2020, the 401(a) contribution rate for Journeyman A may increase as a result of periodic allocations.  If there is an increase to Journeyman A, then Journeyman B, C, D, E, F, G and H will also increase, according to the amount allocated to Journeyman A.

The parties agree to the above increases effective July 1, 2023. Each annual increase in compensation shall be first allocated as increases in the contributions on behalf of covered bargaining unit employees to the associated benefit funds identified in this collective bargaining agreement in the amounts designated in writing as necessary increases by the respective benefit fund trustees. Any remaining portion of this wage increase shall then be allocated to the hourly wage rate of the covered bargaining unit employees.

35

For the Credit Union Savings Plan deduction, refer to Addendum VIII, SECTION 5(2).

The following classifications of Journeyman (B, C, D, E, F, G, H) indicate how taxable wages are affected by a Journeyman's election to have a higher 401(a) contribution level.  All other fringes are the same as for Journeyman A.

**Journeyman B**                                  **Effective July 1, 2023**

| Taxable Wage | $46.60 |
|---|---|
| Overtime Wage (x 1.5) | $70.40 |
| Overtime Wage (x 2) | $94.20 |
| 401(a) Contribution | $2.50 |

**Journeyman C**                                  **Effective July 1, 2023**

| Taxable Wage | $45.60 |
|---|---|
| Overtime Wage (x 1.5) | $69.40 |
| Overtime Wage (x 2) | $93.20 |
| 401(a) Contribution | $3.50 |

**Journeyman D**                                  **Effective July 1, 2023**

| Taxable Wage | $44.60 |
|---|---|
| Overtime Wage (x 1.5) | $68.40 |
| Overtime Wage (x 2) | $92.20 |
| 401(a) Contribution | $4.50 |

**Journeyman E**                                  **Effective July 1, 2023**

| Taxable Wage | $43.60 |
|---|---|
| Overtime Wage (x 1.5) | $67.40 |
| Overtime Wage (x 2) | $91.20 |
| 401(a) Contribution | $5.50 |

**Journeyman F**                                  **Effective July 1, 2023**

| Taxable Wage | $42.60 |
|---|---|
| Overtime Wage (x 1.5) | $66.40 |
| Overtime Wage (x 2) | $90.20 |
| 401(a) Contribution | $6.50 |

**Journeyman G**                                  **Effective July 1, 2023**

| Taxable Wage | $41.60 |
|---|---|
| Overtime Wage (x 1.5) | $65.40 |
| Overtime Wage (x 2) | $89.20 |
| 401(a) Contribution | $7.50 |

**Journeyman H**                                  **Effective July 1, 2023**

| Taxable Wage | $40.60 |
|---|---|
| Overtime Wage (x 1.5) | $64.40 |
| Overtime Wage (x 2) | $88.20 |
| 401(a) Contribution | $8.50 |

The following classifications of Apprentice (B) indicate taxable wages for an Apprentice electing to have a higher 401(a) contribution level.

**Apprentice B (1st year, 1st half 45%)**　　　　**Effective July 1, 2023**

| | |
|---|---|
| Taxable Wage | $20.42 |
| Overtime Wage (x 1.5) | $31.13 |
| Overtime Wage (x 2) | $41.84 |
| 401(a) Contribution | $2.40 |

**Apprentice B (1st year, 2nd half 50%)**　　　　**Effective July 1, 2023**

| | |
|---|---|
| Taxable Wage | $22.80 |
| Overtime Wage (x 1.5) | $34.70 |
| Overtime Wage (x 2) | $46.60 |
| 401(a) Contribution | $2.40 |

**Apprentice B (2nd year, 1st half 55%)**　　　　**Effective July 1, 2023**

| | |
|---|---|
| Taxable Wage | $25.18 |
| Overtime Wage (x 1.5) | $38.27 |
| Overtime Wage (x 2) | $51.36 |
| 401(a) Contribution | $2.40 |

**Apprentice B (2nd year, 2nd half 60%)**　　　　**Effective July 1, 2023**

| | |
|---|---|
| Taxable Wage | $27.56 |
| Overtime Wage (x 1.5) | $41.84 |
| Overtime Wage (x 2) | $56.12 |
| 401(a) Contribution | $2.40 |

**Apprentice B (3rd year, 1st half 65%)**　　　　**Effective July 1, 2023**

| | |
|---|---|
| Taxable Wage | $29.94 |
| Overtime Wage (x 1.5) | $45.41 |
| Overtime Wage (x 2) | $60.88 |
| 401(a) Contribution | $2.40 |

**Apprentice B (3rd year, 2nd half 65%)**　　　　**Effective July 1, 2023**

| | |
|---|---|
| Taxable Wage | $29.94 |
| Overtime Wage (x 1.5) | $45.41 |
| Overtime Wage (x 2) | $60.88 |
| 401(a) Contribution | $2.40 |

**Apprentice B (4th year, 1st half 70%)**　　　　**Effective July 1, 2023**

| | |
|---|---|
| Taxable Wage | $32.32 |
| Overtime Wage (x 1.5) | $48.98 |
| Overtime Wage (x 2) | $65.64 |
| 401(a) Contribution | $2.40 |

**Apprentice B (4th year, 2nd half 75%)**　　　　**Effective July 1, 2023**

| | |
|---|---|
| Taxable Wage | $34.70 |
| Overtime Wage (x 1.5) | $52.55 |

| Overtime Wage (x 2) | $70.40 |
|---|---|
| 401(a) Contribution | $2.40 |

**Apprentice B (5th year, 1st half 80%)**             **Effective July 1, 2023**

| Taxable Wage | $37.08 |
|---|---|
| Overtime Wage (x 1.5) | $56.12 |
| Overtime Wage (x 2) | $75.16 |
| 401(a) Contribution | $2.40 |

**Apprentice B (5th year, 2nd half 85%)**             **Effective July 1, 2023**

| Taxable Wage | $39.46 |
|---|---|
| Overtime Wage (x 1.5) | $59.69 |
| Overtime Wage (x 2) | $79.92 |
| 401(a) Contribution | $2.40 |

(b).  The Employer agrees to pay all employees covered by this Agreement current contract wages/fringes paid to the employees, whether they are performing bargaining unit work or non-bargaining unit work as per Addendum VIII, SECTION 1 (a) of this Agreement.

**SECTION 2.**

(a) Each shop must have a foreman.

(b) On any job where 5 to 10 employees in the bargaining unit are employed for more than one day, one of such employees shall be designated by the Employer as Working Foreman (10% above base wage).  When a job requires 11 to 15 employees, there shall be one Working Foreman (10% above base wage) and one Working General Foreman (15% above base wage); 16 to 21 men there shall be two Working Foremen and one Working General Foreman; for each additional five men employed there shall be an additional Working Foreman, all appointed from among the employees in the Bargaining Unit.  On any jobsite when 25 or more members of the bargaining unit are employed, a total of bargaining unit employees and another building trades craft equaling 25 or more, on the same payroll, the bargaining unit supervisor shall be designated Superintendent (20% above base wage) and compensated according to the attached Addendum.  While such individuals shall be considered lead men and shall prove their efficiency such individuals shall not exercise any of the functions customarily exercised by supervisors within the meaning of the National Labor Relations Act, as amended, nor shall such individuals in any way be deemed to be an agent of the Union.

**SECTION 3.  Health and Welfare Fund**

It is agreed that all employees in the collective bargaining unit shall participate in the Sheet Metal Workers' Local Union No. 20 Health and Welfare Fund, as signed by the Trustees of the Employer and the Union, the terms and conditions of which are incorporated herein and made a part of this Agreement.

The Employer agrees to pay the amounts specified in Article VIII, Section 1 (a) of this Addendum for "Health & Welfare" for each hour worked by its employees covered by this Agreement, including all non-bargaining unit work and bargaining unit work, into Sheet Metal Workers' Local Union No. 20 Health & Welfare Fund, on or before the 20th day of each month for work performed during the preceding month.

The Employer agrees to deposit the amounts specified for each hour worked by a participant into the Sheet Metal Workers' Local Union No. 20 Health and Welfare Fund, or into any successor Fund with the same purpose and which is designated by vote of the membership during the term of this contract to receive such contributions.

**SECTION 4.  Gary Area Local Pension Fund**

It is agreed that all applicable employees in the collective bargaining unit shall participate in the Sheet Metal Workers' Local Union No. 20 (Gary Area) Pension Fund.

This Fund is governed in accordance with the Terms and provisions of an Agreement and Declaration of Trust creating said Pension Fund, as signed by the Trustees of the Employer and the Union, the terms and conditions of which are incorporated herein and made a part of this Agreement.

The Employer agrees to pay the amount specified in Article VIII, Section 1 (a) of this Addendum for "Local Pension" for each hour worked by its employees covered by this Agreement, including all non-bargaining unit work and bargaining unit work, into the Sheet Metal Workers' Local Union No. 20 (Gary Area) Pension Fund on or before the 20th day of each month for work performed during the preceding month.

**SECTION 5.  Federal Credit Union Savings Plan**

(1) Employer shall withhold from wages of each employee subject to this Agreement the following amount for the number of hours worked.  This withholding shall hereinafter be referred to as a savings deduction and placed in a Trust Fund which is the GESB Federal Credit Union.  The minimum savings deduction will be ($1.00) one dollar ($0.50 for pre-apprentices) for each hour worked and shall continue the same until the termination of this Agreement.

The Employer shall treat said amounts to the Savings Plan as wages, and shall make all legal payroll deductions for Withholding Tax, Social Security, etc., from the total wages, and shall set aside this full amount for transmittal to the GESB Federal Credit Union, 6450 Ameriplex Drive, Portage, IN in a separate check.  Any contributions which are due as a result of payroll periods ending between the 3rd and 18th of the month are due on or before the 25th of that month.  Any contributions which are due as a result of payroll periods ending between the 19th of the month and the 2nd of the following month shall be due on or before the 10th of that month.  Failure of the Employer to make the required contributions as set forth herein shall give rise to all remedies afforded the Union as set forth in Section 13 of this Addendum VIII.

During the week of January 1 and July 1 of each year, the member may increase or decrease his credit union payroll deduction amount; however, the minimum deduction is $1.00 per hour. ($0.50 for pre-apprentices)

**SECTION 6.  SASMI**

It is agreed the Employer shall make monthly payments of an amount equal to three (3%) of the gross earnings of each applicable employee subject to this Agreement to the National Stabilization Agreement of the Sheet Metal Industry (SASMI).  Gross earnings, for the purpose of this Agreement shall mean (a) total wages paid to an employee by the Employer, which are reportable by the employee for Federal Income Tax purposes, and (b) any and all contributions paid by such Employer on behalf of the Employee to Pension and Health and Welfare Funds.

The Employer agrees to adopt the National SASMI Trust as presently constituted and as the same may be amended from time to time be bound by all Rules and Regulations of the plan as adopted by the Trustees, or as presently existing and as the same may be amended from time to time and to sign the standard Participation Agreement prescribed by the Trustees as a condition of becoming a party to and participant in such Trust.

SECTION 6(a) An Employer that has been delinquent in making contributions to any national or local fund shall, upon written notification of the trustees or local union, make the specified payment to such fund at weekly intervals.  Such obligation shall continue until the Employer has not been delinquent in making contributions for a period of three (3) consecutive months.

**SECTION 7.   National Pension Fund**

It is agreed that all applicable employees in the Collective Bargaining unit shall participate in the Sheet Metal Workers' National Pension Fund and the Employer agrees to deposit the amounts specified in Article VIII, Section1(a) into the Sheet Metal Workers' National Pension Fund. The Employer agrees to adopt the Sheet Metal Workers' National Pension Fund "Standard Form of Participation Agreement Plan A" or "Standard Form of Participation Plan B."

Effective July 1, 1997, the contribution rate to the Sheet Metal Workers' National Pension Fund for all apprentices will be based upon the same percentage as their wage rate.

**SECTION 8.  Educational and Training Fund**

The Employers agree to pay the amount specified in this Agreement for each hour worked by journeymen, apprentice, and preapprentice employees covered by the Agreement to the Sheet Metal Workers' Local Education Fund on or before the 20th day of each month for the preceding month to a depository designated by the Fund Trustees.  The Fund shall be jointly administered by the Joint Apprentice Training Trust.  The Trust shall administer the Fund for educational and training purposes, pursuant to Trust Agreement.

(1) Effective as of the date of this Agreement the Employers will contribute to the Sheet Metal Workers' International Association Scholarship Foundations, Inc., one cent ($0.01) per hour for each hour worked by each employee of the Employer covered by this Agreement.  Payment shall be made on or before the 20th day of the succeeding month and shall be remitted for the purposes of transmittal through the International Training Institute.

41

### SECTION 9.  International Training Institute

It is agreed that all employees in the Collective Bargaining unit shall participate in the Sheet Metal Workers International Training Institute and the Employer agrees to deposit the amount specified in Article VIII, Section 1 (a) into the Sheet Metal International Training Institute.  The Employer agrees to adopt the Sheet Metal Workers International Training Institute "Standard Form of Participation Agreement."

### SECTION 10.  Building and Construction Resource Center, Inc.

Various Employer Associations under this Agreement and the Union are members of Building and Construction Resource Center, Inc.  (hereinafter "BCRC") a non-profit corporation, that was formed to provide services in the construction industry concerning alcohol, drug, and other substance abuse.

Each Employer under this Agreement shall pay to BCRC the sum of fifteen cents ($0.15) per hour for each hour worked by each of its employees covered by this Agreement.  Each Employer is obligated to make such contributions, regardless of whether or not such Employer is a member of BCRC.

Payments required to be made to BCRC shall be deemed to be governed by the provisions of this Agreement pertaining to the collection of the Health & Welfare and Pension payments required to be made by the Employers and thus, may be enforced in the same manner.

The Board of Directors of BCRC will have full audit authority of the Employer's books and records as they pertain to this contribution.

If at any time during the term of this Agreement, assuming both parties agree to do so, it will be deemed permissible to establish a new self-administered Substance Abuse and EAP Program in lieu of the program specified above.

### SECTION 11.  Labor/Management Trust Fund.

The Employers agree to pay the amount specified in this Agreement – six cents ($0.06) – for each hour worked by each applicable employee covered by this Agreement to the Labor/Management Trust Fund.  Payment shall be made on or before the 20th day of the succeeding month and shall be remitted for purposes of collection and transmittal through the Local 20 Health & Welfare Fund, 2828 East 45th Street, P.O. Box 55287, Indianapolis, IN 46205.

### SECTION 12.  Defined Contribution Plan

It is agreed that all applicable employees in the collective bargaining unit shall participate in the Sheet Metal Workers Local Union No. 20 Defined Contribution Pension Fund, the Trust Agreement of which, as amended and restated from time to time, is incorporated herein by reference and made part of this Agreement.  The Employer agrees to pay the amount specified in Article VIII, Section 1(a) of this Addendum for "401 (a) Plan" for each hour worked by its

employees covered by this Agreement, including all non-bargaining unit work and bargaining unit work, into the Sheet Metal Workers Local Union No. 20 Defined Contribution Pension Fund, at the depository designated by the Trustees of the Fund. Any contributions which are due as a result of payroll periods ending between the 3rd and 18th of the month are due on or before the 25th of that month. Any contributions which are due as a result of payroll periods ending between the 19th of the month and the 2nd of the following month shall be due on or before the 10th of that month. Failure of the Employer to make the required contributions as set herein shall give rise to all remedies afforded to the Union as set forth in Section 13 of this Addendum VIII.

### SECTION 13.  Delinquent Payments on Fringe Benefits

(1) Any individual Employer obligated to submit contributions for Welfare Fund, Pension Fund, Local Education Fund, Industry Fund, Labor Management Trust, GESB Federal Credit Union, National Pension Fund, SASMI, EAP, International Training Institute, and Local No. 20 Defined Contribution Pension Plan, any of which are not received by the 20th of the month or as otherwise stated in this Addendum, shall be considered a delinquent Employer and shall be in violation of this Agreement.

(2) Insofar as payment by the individual Employer into the respective Trust Funds are concerned, time is of the essence. The parties recognize and acknowledge that the regular and prompt payment of amounts due by individual Employers to these Funds is essential and that it would be extremely difficult, if not impracticable, to fix the actual expense and damage to the Funds and to the covered employees which will result from failure of an individual Employer to make such monthly payments in full within the time provided.

(3) It is agreed that the respective Funds Trustees are empowered to order an audit of the Employer's payroll records available to authorized auditors for an audit upon ten days notice.

(4) All contractors shall post a bond in accordance with the following schedule:
(A cashier's check or the equivalent may be used in lieu of a bond)

| | |
|---|---|
| 1 man | $11,000 |
| 2 men | $22,000 |
| 3-5 men | $44,000 |
| 6-10 men | $55,000 |
| 11-30 men | $66,000 |
| 31-50 men | $77,000 |
| 51 men & over | $88,000 |

The bond shall be in a form and written by a surety company acceptable to the Union guaranteeing prompt payment of all monies for:  Sheet Metal Workers' Local 20 Welfare Fund, Sheet Metal Workers' Local 20 (Gary Area) Pension Fund, Sheet Metal Workers' Local Education Fund, GESB Federal Credit Union, International Training Institute, SASMI, E.A.P., Sheet Metal Workers' National Pension Fund, Wages, Northern Indiana Sheet Metal Contractors' Industry Fund, National Industry Fund, Local No. 20 Defined Contribution Pension

Plan and Joint Labor Management Fund.  In accordance with the terms of this Collective Bargaining Agreement and the various trust documents establishing such Funds, the bond as secured shall run in favor of the Union and shall be deposited with the Union.  The bond shall guarantee the contractors required payments to each of the above Funds and copies of such bond shall be deposited with each of said respective Funds.  Failure to do so shall permit the Union to terminate this Agreement upon the giving of 72-hours notice in writing.

(5) The Agreements and Declarations of Trusts for all Funds referred to in this Agreement, are hereby made a part of this Collective Bargaining Agreement.

(6) Failure to contribute to any Funds created pursuant to this Agreement may be grounds for immediate cancellation of this Agreement by the Union by giving to the delinquent Employer a 72-hour written notice.  The cancellation of this Agreement may be in addition to any other remedies available to the Union or to the Trustees of the particular Fund involved and shall not absolve the Employer of liability for the payment into the particular Fund or Funds the amount required for hours worked by the employees.  In lieu of possible cancellation of this Agreement, the Union may direct the employees of the delinquent Employer to cease performing services for said Employer until the Employer complies with all of the terms and conditions of this Article and reports and pays to all fringe benefit funds contained in this Article the amounts due the Funds for which he is delinquent.

(a) An employer that has been delinquent in making contributions to any national or local fund shall, upon written notification of the trustees or local union, make the specified payment to such fund at weekly intervals.  Such obligation shall continue until the Employer has not been delinquent in making contributions for a period of 3 consecutive months.

(7) It is agreed that contributions required to be paid to the Sheet Metal Workers' Local 20 (Gary Area) Pension Fund, the Sheet Metal Workers' Local 20 Welfare Fund and Sheet Metal Workers' Local Education Fund  (hereafter referred to individually as "Fund"), Industry Fund, GESB Federal Credit Union, International Training Institute, SASMI, E.A.P., National Pension Fund and Local No. 20 Defined Contribution Pension Plan shall be subject to the following interest charges and liquidated damages.

(a) An Employer whose Contribution is received by a Fund after the date on which payment is required under the terms of this Collective Bargaining Agreement shall be obligated to pay interest on all monies due to that Fund from the date due until the date payment is received, at the interest rate prescribed from time to time under Section 6621 of the Internal Revenue Code of 1954, and shall further be obligated to pay all expenses of collection incurred by the Trustees of that Fund, including costs and reasonable attorney's fees.

(b) An Employer whose Contribution is received by a Fund after the date on which payment is required under the terms of this Collective Bargaining Agreement shall be obligated to pay, in addition to all sums due to that Fund (including interest, cost and attorney's fees herein provided), liquidated damages in an amount equal to 5% of the unpaid contributions, the actual damage resulting from such late payment being substantial, but difficult to ascertain.

(8) The Trustees of each Fund shall be empowered in their sole discretion (but

shall not be required) to adopt rules of uniform application providing for the waiver of interest or liquidated damages and to adopt a Grace Period, within the calendar month, during which contributions which are otherwise late shall be considered to have been received in a timely manner.

# ADDENDUM IX
## REF: ARTICLE IX

SECTION 1.  Employees covered by this Agreement shall provide for themselves all necessary hand tools, including, but not limited to:

Hammer
Tape measures
Appropriate hand snips
Dividers
Pliers
Screw drivers
Cold chisel
Plumb bob
Trammel points
Adjustable square
Small pinch bar
Hack saw frame
Vise grip pliers
Prick punches
Scratch awl
Metal hand punch
Hand tongs
Tool box
Drift pins
Chalk line
Calculator
Torpedo level

The employee shall be permitted to carry with their personal tools an Employer supplied battery operated drill with a 3/8" chuck and charger.

(a).  All employees will be compensated with full benefits when taking welding tests for certification at the Employer's request.  Specialty classes, when outside industry standards as defined by the Safety Committee, will be compensated at base wages less benefits package.

SECTION 2.  **INJURED EMPLOYEE**:  When injured on the job, an employee shall report all injuries to a company representative and he shall be compensated at the regular rate of pay (wages and benefits) for any time that is lost because of emergency treatment.  The injured employee shall also be compensated at the regular rate of pay (wages and benefits) for one subsequent follow-up medical visit after returning to work up to eight (8) hours.  If injury results in a full day loss of time on the day of the injury, the injured employee shall be compensated in

full (wages and benefits) for that day.  Employee shall verify with Employer any further instructions and appointments as prescribed by medical personnel.

An employee should report any on-the-job injury for which compensation may be paid to his foreman on the day of the injury.  If an on-the-job injury is not immediately recognized which may require medical attention, the employee should notify the Employer's office or designated representative within 48 hours after he reasonably believes he has incurred such injury.  Any employee who requests a blood test in a hazardous area (lead, etc.) shall have a blood test monthly, paid by the Employer as per OSHA regulations.

SECTION 3.  To maintain a high level of craftsmanship, each employee shall install all sheet metal work in a safe and workmanlike manner in accordance with the Employer's instructions, applicable codes, and specifications.  Employees shall be required to make corrections on improper workmanship of installation or erection for which they are responsible on their own time and during regular working hours unless errors were made by the order of the Employer.  The Employer shall refer such matters to one representative chosen by the Employer or Employers, party to this Agreement, and one representative chosen by Local 20 for adjustment; if the matter cannot be settled by these representatives, it shall be referred to the Joint Adjustment Board for final determination.

SECTION 4(a).  **SAFETY**.  Each Employer shall promote an active safety program which, shall include:

1. Designating full or part time safety personnel.
2. Conducting safety meetings at least once a week, on all jobs where twenty (20) or more workmen are employed.
3. Arranging for medical care, ambulance service, post names of ambulance service, doctors' names, and telephone numbers in construction office on jobsite.
4. Furnishing adequate first aid supplies stockpiled at the jobsite.
5. Conforming to the Williams Steiger Occupations Safety and Health Act of 1970 (OSHA), and/or the State Plan as provided under Section 18 (H) of the Occupational Safety and Health Act of 1970.
6. Furnishing two (2) copies of all reports of major accidents to the Union Office.
7. Supplying insulating masks.
8. Supplying welding hoods, burning goggles, welding gloves and leathers.
9. Furnishing aluminum welding leads for high-bay welding.

(b).  Each employee has the duty to comply with safety and health standards and all rules, regulations, and orders issued pursuant to the provision of the Occupational Safety & Health Act (OSHA) in the performance of their work. All employees shall be required to attend continuing safety education programs as provided for by the Gary Area Safety Subcommittee.  The Committee shall consist of an equal amount of members, half of whom will be selected by the Employer, half by the Union.  There shall be a minimum of four (4) members.  Said Committee shall formulate and make operative the Local 20 Gary Area Safety Education Directive in regards (but not limited) to curriculum, scheduling, wages and enforcement.  Said directive when formulated and adopted by the parties hereto shall be recognized as part of this agreement.  All members as part of this directive shall have attended an

OSHA 30 Program as well as have current first aid and CPR Certifications. These programs will be administered by the JATC.

SECTION 5.  **SAFE TOOLS AND EQUIPMENT**.  All tools and equipment furnished by the Employer shall be in good condition.

SECTION 6.  **HEIGHT AND CONGESTION PRECAUTIONS**.  Where work is over twenty (20) feet above the ground where ladders are used and there is a slippery base, or where work is being performed in a location where congested traffic conditions exist, two (2) employees shall be on the job, one to steady and protect the ladder.

SECTION 7.  **STORAGE AND CHANGE FACILITIES**.  The Employer shall furnish to members of the bargaining unit on outside construction sites adequate storage facilities for employee's tools, and also suitable facilities for employees to store their clothing, change their clothing and eat their lunch.  The Employer also agrees to provide adequate protection for safeguarding the employee's tools at the jobsite and in the shop.

SECTION 8.  **TOILET AND WASHING FACILITIES**.  The Employer shall furnish adequate toilet and washing facilities on all jobs when necessary, to maintain sanitary and healthful conditions for workmen.  If water is not available on the jobsite, Employers shall furnish waterless soap and towels.

SECTION 9.  **DRINKING WATER**.  The Employer shall furnish safe drinking water on all jobs when necessary, by means that prevent contamination between the source and the consumer.  Salt tablets shall be supplied in hot weather.

SECTION 10.  **PROTECTIVE CLOTHING AND EQUIPMENT**.  The Employer shall furnish hard hats, liners and safety goggles, nonprescription safety glasses and gloves to the workmen when same are required.  The hats and liners shall be cleaned out and sterilized before being transferred for use from one employee to another.  He shall also furnish proper rain gear when men are required to work in the rain, or any other kind of protective clothing or equipment necessary to perform the work, inclusive of Fire Retardant clothing when required.  It is also agreed that the contractor will pay fifty percent of the cost for safety shoes up to $100 and the employer agrees to provide metatarsal boots (not slip covers) not to exceed $300 if required for employment one time per year.

# ADDENDUM X
## REF:  ARTICLE X

SECTION 1 (a).  **STEWARD'S PROGRAM**.  It is understood and agreed that on every job undertaken by the Employer, there shall be a Steward for said job or said shop.  The number will not exceed one (1) Steward for every twenty (20) employees on any particular job or shop. He shall be a Working Steward and shall perform the duties of a Journeyman Sheet Metal Worker.  The Steward shall have the right and duty to observe and make a report to the Employer's Office and the Union involved of any grievance, dispute or controversy involving the interpretation or application of any terms of this Agreement so that efforts can be made to adjust same.  He shall report to the Union Office all overtime work to be performed including

Saturdays, Sundays and Holidays.  The Employer shall not in any manner interfere with the Steward in the performance of his duty to cause any retaliation or discrimination whatsoever because of the carrying out of his duty.  A Steward shall not abuse his position as a Steward at the expense of his Employer and shall not be responsible for the hiring of personnel or selecting people for layoff.  The authority of the Steward shall be limited to what has been set forth herein and under no circumstances shall the Steward, directly or indirectly, have the authority to call a work stoppage of any type.  (The Union will be responsible for establishing a Steward's schooling program.)

The Steward shall be on the job at all times, except on overtime jobs involving less than four (4) men, and be the last man laid off with the exception of the foreman.  The Steward shall have access to the Employer's telephone when making a report to the union while on a jobsite or in the shop.

SECTION 1(b) The Employer shall notify the Business Manager or Business Representative five (5) working eight (8) hour days before the employment of a Steward is terminated by the Employer.  If the Representative disagrees with the Employer's reason for this termination, they shall immediately try to negotiate a resolution.  If the dispute cannot be mutually resolved during the first working day, the Local Joint Adjustment Board shall be convened on the second working day after the notification of the Union Representative by the Employer.  If the LJAB cannot reach an agreement by the fifth working day after notification the dispute shall be submitted to the National Joint Adjustment Board.

## ADDENDUM XI
### REF:  ARTICLE XI

SECTION 1(a).  Pre-apprentices will participate in the Local Health and Welfare Fund at the same rate as journeymen and apprentices.

(b). After one (1) year in the industry, the wage rate for pre-apprentices will be 40% of journeyman rate plus seventy-five cents ($0.75).

SECTION 2 (a).  The apprenticeship ratio specified in Article XI, Section 4 shall be maintained within the Company and on all work outside the regular working hours.  Apprentices shall not be allowed to work outside the jurisdiction of Local Union No. 20.  All journeymen, apprentices and preapprentices shall work under the supervision of a sheet metal journeyman of Local No. 20 at all times.

SECTION 3 (a).  Effective January 1, 2021, contractors shall combine the hourly contribution previously designed as "School Pay" with the hourly contribution amount required to be made to the Local Education Fund under this contract for a current contribution amount of $1.01. The JATC shall make a monthly stipend to indentured apprentices as set forth in the JATC Apprenticeship Standards. This is a variable amount that may be increased or decreased at any time during the term of the contract to adequately provide for the cost of the monthly stipends.

(b) **Safety Fund.** The Employer agrees to pay the amount for each hour worked, as determined by the safety committee, for each employee to the Local Education Fund.

(c) Payment shall be made on or before the 20th day of the succeeding month and shall be remitted for the purpose of collection and transmittal through the Local 20 Health and Welfare Fund, 2828 East 45th Street, P.O. Box 55287, Indianapolis, Indiana 46205. These Funds are above and beyond the Local Education Fund and shall not be included in the Wage Schedule as described in Addendum VIII, SECTION 1 (a) of this Agreement.

# ADDENDUM XII

SECTION 1(a). The apprentice, preapprentice ratio to journeymen will be modified from the Standard Form of Union Agreement A-3-86 as follows:

| Journeymen | Apprentices | | Preapprentices |
|:---:|:---:|:---:|:---:|
| 1 | 1 | OR | 1 |
| 3 | 1 | AND | 1 |
| 6 | 2 | " | 1 |
| 9 | 3 | " | 1 |
| 12 | 4 | " | 1 |
| 15 | 5 | " | 1 |
| 18 | 6 | " | 2 |
| 21 | 7 | " | 2 |
| 24 | 8 | " | 2 |
| 27 | 9 | " | 3 |
| 30 | 10 | " | 3 |
| 33 | 11 | " | 3 |
| 36 | 12 | " | 4 |
| 39 | 13 | " | 4 |
| 42 | 14 | " | 4 |
| 45 | 15 | " | 5 |

After forty-five (45) the apprentice, preapprentice ratio reverts back to the Standard Form of Union Agreement. Apprentices have seniority over pre-apprentices. No preapprentices will be allowed to work in the field on prevailing wage projects.

# ADDENDUM XIII
## CODE OF EXCELLENCE

It is agreed that the "CODE OF EXCELLENCE" Policy as written and approved by the International Association of Sheet Metal, Air, Rail and Transportation Workers (SMART) has been adopted, in order to demonstrate and showcase the skills and professionalism of SMART members.

# ADDENDUM XIV

## REF: ARTICLE XIII

This Agreement shall be equally binding on any purchaser or successor, of any or all part of any signatory Contractor.

## ADDENDUM XV
### INDUSTRIAL ADDENDUM

It is agreed that the "Industrial Addendum" as written and approved by the Northern Indiana Sheet Metal Contractors' Association, Inc. must be signed by individual Contractors, in order to be put into effect by the signatory Contractors.

## ADDENDUM XVI
### RESIDENTIAL ADDENDUM

It is agreed that the "Residential Addendum" as written and approved by the Northern Indiana Sheet Metal Contractors' Association, Inc. must be signed by individual Contractors, in order to be put into effect by the signatory Contractors.

## ADDENDUM XVII
### SERVICE ADDENDUM

It is agreed that the "Service Addendum" as written and approved by the Northern Indiana Sheet Metal Contractors' Association, Inc. must be signed by individual Contractors, in order to be put into effect by the signatory Contractors.

# SMART LOCAL NO. 20 OFFICES

### SMART Local No. 20-Gary
6450 Ameriplex Drive
Portage, IN 46368-1389

_____

### SMART Local No. 20-Evansville
1301 W. Franklin Street
Evansville, IN 47710-1027

### SMART Local No. 20-Ft. Wayne
3019 Waynewood Drive
Fort Wayne, IN 46809-2630

### SMART Local No. 20-Indianapolis
2828 East 45th Street
Indianapolis, IN 46205

### SMART Local No. 20-Lafayette
2535 S. 30th Street, Suite 14
Lafayette, IN 47909-2786

### SMART Local No. 20-South Bend
2605 S. Main Street
South Bend, IN 46614-1017

### SMART Local No. 20-Terre Haute
31 ½ South 13th Street
Terre Haute, IN 47807-3907